IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

SANTIAGO VILLAUEVA PINEDA
(1), RAMIRO ALVARADO
GONZALEZ (2), JAMES TORRES
(3), TARSICIO BRAVO-CARVAJAL
(4), BERNALDO
MOLINA-CARDENAS (5),
JUVENTINO BAZA (7), PABLO
GARCIA (8), JOSE CARLOS SOTO-
PINEDA (10), ISAIAS
MONDRAGON (12),
NARCISO FLORES-ORTIZ (13),
GREGORY EARL HARRISON (14),
CHADWICK HUDSPETH (15),

Defendants.

CRIMINAL CASE NO.

1:11-CR-00006-CAP-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Santiago Villanueva Pineda's motion

[Doc. 264] to suppress evidence and motion [Doc. 265] for disclosure of confidential

informants; Defendant Juventino Baza's motion [Doc. 198] for severance, motion

[Doc. 199] for disclosure of confidential informants and motion [Doc. 201] to suppress

evidence; and Defendant Gregory Harrison's motion [Doc. 269] for disclosure of confidential informants and motion [Doc. 272] to suppress evidence. After conducting evidentiary hearings on the pending motions to suppress and reading and considering the briefs submitted by Defendants and the Government on the pending motions, the court **RECOMMENDS** that, for the reasons and based upon the authority cited herein, the motions be **DENIED**.

Also showing as pending on the docket is Defendant Narciso Flores-Ortiz's motion [Doc. 196] to suppress evidence. The Government having informed the court that it does not intend to introduce the challenged evidence at trial, the court **RECOMMENDS** that the motion be **DENIED AS MOOT**.

### Defendant Santiago Villanueva Pineda's Motion to Suppress

Defendant Villanueva Pineda filed a motion [Doc. 264] seeking to suppress evidence seized from a warrantless search of his residence, 319 Park Circle, Marietta, Georgia 30008, and seized from his two businesses, Alex Rims and Tires and Emmy Tires, pursuant to federal search warrants. The Government advised that no evidence was seized which the Government intends to introduce at trial as a result of the search at 319 Park Circle. In the supplemental brief filed in support of the motion seeking to suppress evidence seized from executing the search warrants at the business locations,

2

Defendant contends that, although there was probable cause for the warrant to issue for Alex Rims and Tires, the application "did not provide probable cause to believe that the entire business was fraudulent[;] therefore, the warrant, which allowed for the seizure of "virtually every record in the business location[,]" was "overbroad and not supported by probable cause." [Doc. 304]. With respect to the business located at Emmy Tires, Defendant contends that there was no probable cause for the issuance of the search warrant because "[n]o illegal activities were observed at" this location and that the application failed "to establish the nexus between the conduct" specified in the warrant and evidence of illegal activity. [Id.].

The Government opposes the motion to suppress contending that, as to the search at Alex Rims and Tires, Defendant did not identify any item seized for which probable cause was not established and that the affidavit for the warrant, which included the affiant's opinion based on his training and experience, established probable cause to seize the items listed on the warrant. [Doc. 314 at 4-7]. As to the affidavit in support of the warrant for Emmy Tires, the Government argues that the circumstances presented in the affidavit in light of the affiant's opinion based on his training and experience established a nexus between the illegal conduct and the business and the items of evidence listed on the warrant. [Id. at 7-9]. In the

3

alternative, the Government contends that the good faith exception to the exclusionary rule applies in this case and that the evidence seized should not be suppressed. [Id. at 9-10].

## I.    Background Facts

The affidavit in support of the search warrant for Alex Rims and Tires first established the training and experience of the affiant, John-Paul Clark, a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). [Doc. 314, Exh. A, Application, ¶¶ 1, 3-7]. Agent Clark's experience included working numerous drug trafficking and money laundering investigations using most of the standard methods of investigation. [Id. ¶¶ 5-6]. Based on his training and experience, Agent Clark stated that he was familiar with how drug traffickers conduct their business, that is, transporting and storing both drugs and drug proceeds, and that he was familiar with how the drug traffickers that were the subject of the instant investigation "move what is needed for prospective drug transactions/immediate sale to 'transaction locations' from 'stash houses/locations'." [Id. ¶ 7]. He further stated that, based upon his training and experience, he knew that drug traffickers (1) set up legitimate businesses to explain their wealth and use drug proceeds to finance these businesses; (2) use legitimate businesses as staging areas for

4

drug trafficking and, in addition to other places, use these secure locations to store contraband, drug proceeds and records for easy access and concealment; and (3) keep large amounts of U.S. currency, "maintain books, records, notes, ledgers, money orders and other papers relating to the transportation, ordering, sale and distribution of drugs[,]" and possess firearms and various items of drug paraphernalia, such as for "packaging, cutting, weighing, and distributing illegal controlled substances[.]" [Id. ¶ 8].

The affiant then explained operation of the instant criminal drug trafficking organization which distributed multi-kilogram quantities of cocaine, marijuana, and methamphetamine in the Atlanta area and then laundered the proceeds from the illegal activity. [Id. ¶ 9]. Specifically, Agent Clark outlined information provided by four confidential informants (whose reliability is not being challenged by Defendant and the court finds sufficiently established in the affidavit) who advised that Defendant Villanueva Pineda managed and oversaw his business, Alex Rims and Tires, which was used as front for the illegal drug activities. Defendant used this business to receive and store multi-kilogram quantities of drugs as well as the proceeds from the sale of the drugs. This information was corroborated by physical and electronic surveillance conducted by the investigating agents. [Id. ¶12]. Affiant detailed three particular

5

incidents, September 1 and 8, 2010, and November 6, 2010, where drugs were transported from Alex Rims and Tires, followed on one occasion by the proceeds of the drug sale being returned to the business. [Id. ¶¶ 13-22]. Finally, the affiant stated that Defendant and other known members of the drug trafficking organization were regularly observed at the business, including in January 2011. [Id. ¶ 23].

The search warrant authorized by Magistrate Judge Russell Vineyard allowed the agents to search for and seize the following categories of items, which were "fruits, evidence, and instrumentalities of crimes" involving "the laundering of proceeds derived from illegal activities in violation of Title 21 U.S.C. 841, and conspiracy to commit the said offenses, in violation of Section 846": (1) "[a]ny and all business and other financial records" having to do with the operation of the business; (2) "[a]ny and all financial records to include but not limited to records documenting the receipt and disposition of U.S. currency or currency equivalents . . .[;]" (3) "[a]ny and all records of warehouse, house or apartment leases[;]" (4) "[a]ny and all records of business or personal travel[;]" (5) "[a]ny and all records of commercial freight[;]" (6) "[a]ny and all records and documents that reflect the names of individuals or business entities . . . which relate to the business operations conducted by and on behalf of members of the drug trafficking organization[;]" (7) included within item (2); (8) "[a]ny and all records

6

relating to payments to or from employees of ALEX TIRES, EMMY TIRES or members of the drug trafficking organization[;]" (9) included within item (2); (10) included within items (1) and (2); (11) "[a]ny and all records relating to the purchase of business or personal assets . . .[;]" (12) "[r]ecords and items indicating occupancy, residency, and/or ownership of the premises . . .[;]" (13) "[p]hotographs, video movie tapes, and/or slides depicting assets purchased by members of the drug trafficking organization[;]" (14) included within items (1) and (2); (15) included within items (1) and (2); (16) "[a]ny and all correspondences, work papers and notes related to the conspiracy[;]" (17) "[a]ny and all of the above-described information that may be stored on magnetic media, including hard drives, diskettes, tapes, or any other media capable of storing information in a form readable by a computer . . .[;]" (18) "[e]lectronic communication devices . . .[;]" (19) "[f]irearms and ammunition . . .[;]" (20) "[a]ny and all secured and/or locked safes, cabinets, boxes, etc., wherein firearms, documents, drugs and/or currency may be located[;]" (21) "[i]llegal drugs . . . and related equipment and/or paraphernalia for purpose of distribution . . .[;]" and (22) "[p]hotographs, in particular photographs of co-conspirators, assets, and/or controlled substances. . . ." [Doc. 314, Exh. A, Search Warrant]. The return for this warrant identifies the following items as having been seized pursuant to the warrant's

7

execution:  five firearms, multiple magazines and rounds of ammunition; a digital scale; three cellular telephones and cellular telephone chargers; and miscellaneous documents.  [Court Exh. A].[1]

The affidavit in support of the search warrant for Emmy Tires likewise established the training and experience of Agent Clark, as set forth *supra*.  [Doc. 314, Exh. B, Application, ¶¶ 1, 3-7].  And Agent Clark stated that he was familiar with how the drug traffickers that were the subject of the instant investigation "move what is needed for prospective drug transactions/immediate sale to 'transaction locations' from 'stash houses/locations'."  [Id. ¶ 7].  He further stated that, based upon his training and experience, he knew that drug traffickers (1) set up legitimate businesses to explain their wealth and use drug proceeds to finance these businesses; (2) use legitimate businesses as staging areas for drug trafficking and, in addition to other places, use these secure locations to store contraband, drug proceeds and records for easy access and concealment; and (3) keep large amounts of U.S. currency, "maintain books,

---

[1]At the court's request, the Government submitted the supplemental inventory provided to Defendant for the items seized: "Missing Persons flyer for Raphael Ortega (w/map on back)"; "Western Union/MoneyGram receipts, Western Union card"; "Legal Docs-Traffic citations, Notice of Hearing (Immigration court), Murray County property receipt, marriage certificate"; "Loose paper containing telephone numbers"; "Loose paper containing names associated with number totals"; "Receipt book (x4)"; "Invoices/shipping orders, bills of lading"; "Utility bills"; and "Loose receipts".

8

records, notes, ledgers, money orders and other papers relating to the transportation, ordering, sale and distribution of drugs[,]" possess firearms and various items of drug paraphernalia, such as for "packaging, cutting, weighing, and distributing illegal controlled substances[.]" [Id. ¶ 8].

The affiant then explained operation of the criminal drug trafficking organization which distributed multi-kilogram quantities of cocaine, marijuana, and methamphetamine in the Atlanta area and then laundered the proceeds from the illegal activity, by smuggling bulk shipments of cash to Mexico hidden in cars transported by the organization. [Id. ¶ 9]. The affiant provided information concerning Defendant Villanueva Pineda's ownership of two tire businesses, Alex Rims and Tires and Emmy Tires, the latter located at 3919 North Expressway, Griffin, Georgia, and stated that Defendant "stores and transports illegal controlled substances by secreting the drugs and/or drug proceeds in tires." [Id. ¶ 12]. To support that statement, Agent Clark related information (1) provided by a confidential informant (whose reliability is not being challenged by Defendant and the court finds sufficiently established in the affidavit) about how the organization operated and (2) gathered by electronic and physical surveillance by agents. Specifically, on September 1, 2010, as a precursor of a larger drug deal between Defendant and another co-conspirator Defendant Gregory

Harrison, a sample of drugs was transported from Alex Rims and Tires by Defendant Villanueva Pineda in a tire loaded into a vehicle and delivered to Defendant Harrison. [Id. ¶¶ 13-15].

The affiant also summarized surveillance at Alex Rims and Tires of the circumstances of the arrival of vehicles at the business with one (usually front, passenger wheel) of the four tire rims not matching the others on the vehicle. Upon arrival at the business, that tire would be immediately removed and taken into the business and replaced with a rim that matched the others on the vehicle. This occurred without the normal business conversation. The affiant concluded "that the unmatched rim and tire likely contained drugs or drug proceeds[.]" [Id. ¶ 16].

The affiant then focused on the operation of Emmy Tires and the business' links to Defendant Villanueva Pineda and other identified members of the drug organization. Defendant applied for a business license for the location on September 20, 2010, and the business opened on September 27, 2010. A business card for the business provided two telephone numbers, 678-235-1195 and 678-598-4997; the latter being linked to Defendant and intercepted over the wire taps. In some instances, the conversations intercepted were related to drugs. The affiant therefore stated that he believes that cellular telephone records related thereto may be found at Emmy Tires. [Id. ¶ 18].

10

After the confidential informant in October 2010 informed agents that Defendant was relocating some of his drug trafficking activities to a location near Jonesboro, Georgia (which is approximately 22 miles from Griffin), agents conducted surveillance at Alex Rims and Tires and Emmy Tires. The affiant advised that agents observed "movement of large numbers of tires between" the two businesses and that those tires were "almost exclusively non-road-worthy," that is, "generally torn, shredded, and/or bald, and thus not suitable to be used on a vehicle." [Id. ¶¶ 19-20]. Agent Clark acknowledged that "standing alone" this information is neither "surprising or suspicious," but he stated that, based on his knowledge of the drug organization, that is, use of tires to transport drugs and drug proceeds, he believed that drugs or drug proceeds were being stored at Emmy Tires. [Id.]. Further, Agent Clark detailed surveillance of Emmy Tires over several months that "failed to show a volume of business even remotely likely to support the number of tires moved to and from the location" and stated that he knew "drug traffickers may try to cover their illegal activity using a front business." [Id. ¶ 22].

Finally, the affiant added that during surveillance, Defendant and other known members of the drug organization, including Defendant Jaimes Torres, a drug courier for Defendant Villanueva Pineda, were observed at Emmy Tires. The affiant repeated

the information concerning the September 8, 2010, delivery of cocaine from Alex Rims and Tires, involving Torres, to Defendant Harrison, with the drug proceeds being returned to the business. [Id. ¶ 23].

The search warrant authorized by Magistrate Judge Vineyard allowed the agents to search for and seize the following categories of items, which were "fruits, evidence, and instrumentalities of crimes" involving "the laundering of proceeds derived from illegal activities in violation of Title 21 U.S.C. 841, and conspiracy to commit the said offenses, in violation of Section 846": (1) "[a]ny and all business and other financial records" having to do with the operation of the business; (2) "[a]ny and all financial records to include but not limited to records documenting the receipt and disposition of U.S. currency or currency equivalents . . .[;]" (3) "[e]mployee records; customer lists; and inventory invoices and lists[;]" (4) "[a]ny and all records relating to payments to or from employees of ALEX TIRES, EMMY TIRES or members of the drug trafficking organization[;]" (5) "[p]ersonal books, records, writings, receipts, insurance records, letters of credit," and related documents, banking records, information related to safety deposit boxes, "and other documents showing the acquisition, secreting, transfer, and/or concealment of assets and the obtaining, conversion, transfer, concealment, and/or disbursement of currency or currency equivalents[;]" (6) included

12

within item (2); (7) "[a]ny and all records relating to the purchase of business or personal assets . . .[;]" (8) "[r]ecords and items indicating occupancy, residency, and/or ownership of the premises . . .[;]" (9) included within items (1), (2), and (5); (10) included within items (2), (5) and (7); (11) "[a]ny and all correspondences, work papers and notes related to the conspiracy[;]" (12) "[t]elephone records[;]" (13) "[a]ny and all secured and/or locked safes, cabinets, boxes, etc., wherein firearms, documents, drugs and/or currency may be located[;]" and (14) "[i]llegal drugs. . . ." [Doc. 314, Exh. B, Search Warrant]. The return for this warrant identifies the following items as having been seized pursuant to the warrant's execution: business license, notebook with phone numbers, receipt book, civil lawsuit paperwork and checks. [Court Exh. B].[2]

## II.   Discussion

As noted, Defendant contends that the warrant for Alex Rims and Tires was overbroad in that the probable cause established for the search of the business did not provide for seizure of all of the records and other documents related to operation of the

---

[2]The Government also provided the supplemental inventory for the search at Emmy Tires:  "Receipt book"; "Spiral notebook containing: inventory, names, phone numbers, prices, notes"; "US District Court Civil Suit paperwork"; "Expired business registrations"; "Tax paperwork"; and "Bill, receipt".

13

business.  Defendant also contends that the affidavit for the warrant to search Emmy Tires did not establish probable cause because there was no nexus established between the criminal activity and the business.  [Doc. 304].  The Government contends that Defendant failed to identify what items seized as a result of execution of the warrant at Alex Rims and Tires was not within the scope of the probable cause established by the affidavit and that, in any event, the warrant was not overbroad and that the second affidavit did establish probable cause for the warrant for Emmy Tires or that, as to both warrants, the good faith exception applies.  [Doc. 314].

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'"  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants

14

should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same). In reviewing the issuance of the search warrant, the undersigned must determine only that the Magistrate Judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam). The validity of the warrant is considered based on the totality of the circumstances. See Brundidge, 170 F.3d at 1352.

Additionally, "'[i]n order for a search to be reasonable, the warrant must be specific. Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'" United States v. Maali, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (quoting In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847,

15

856-57 (9ᵗʰ Cir. 1991)).  In this case, Defendant is only challenging the breadth of the warrant for Alex Rims and Tires.  [Doc. 304 at 2-3].  "'The scope of the warrant, and the search, is limited by the extent of probable cause. . . .  [P]robable cause must exist to seize all items of a particular type described in the warrant,' and '[t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant.'"  Id. (citation omitted); see also United States v. Smith, 424 F.3d 992, 1004 (9ᵗʰ Cir. 2005) ("The purpose of the breadth requirement is to limit the scope of the warrant 'by the probable cause on which the warrant is based.'") (citation omitted).  The breadth requirement, therefore, prevents "'general, exploratory rummaging in a person's belongings.'"  Smith, 424 F.3d at 1004 (citation omitted).

### a. Search Warrant for Alex Rims and Tires

Defendant has failed to identify any particular item seized during execution of the warrant for which probable cause was not established in the affidavit.  [Doc. 304]. The seizure of the firearms, ammunition and cellular telephones pursuant to the warrant do not appear to be the focus of Defendant's over breadth challenge[3]; instead,

---

[3]And a challenge directed at those items would not be successful, as all three items are recognized as tools of the drug trade.  United States v. Smith, 918 F.2d 1501, 1509 (11ᵗʰ Cir. 1990) (firearms are "'tools of the trade'") (citation omitted); United

16

he focuses on the scope of the warrant's identification of the business documents and records, financial and banking records, travel records, contact records, and other documents and records reflecting personal and business related transactions subject to seizure. [Doc. 304 at 2-3; and see Exh. A, Search Warrant, Attach. B, ¶¶ 1-17]. He argues that, because the affidavit does not establish that the entire business operation was a criminal enterprise, authorizing seizure of all the business' records is not supported by probable cause. [Doc. 304 at 2].

Contrary to Defendant's assertion, the facts set forth in the affidavit do establish that the business' operation was predominately for the purpose of facilitating the illegal activity. Defendant operated Alex Rims and Tires as a front for the drug trafficking organization, which included the collection of drug proceeds and laundering of those

States v. Lisbon, __ F. Supp. 2d __, 2011 WL 6014453, at *24 (N.D. Ga. December 12, 2011) ("the Eleventh Circuit and numerous other federal appellate courts recognize that cell phones are 'a known tool of the drug trade'") (citations omitted); United States v. Meador, 2008 WL 4922001, at *15 (E.D. Mo. January 1, 2008) (same); see also United States v. Prather, 279 Fed. Appx. 761, 766 (11th Cir. 2008) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location."); United States v. Acosta, 807 F. Supp. 2d 1154, 1261 (N.D. Ga. 2011) ("Due to the fact that firearms are tools of the drug trade, the firearms were properly seized as evidence in plain view."); United States v. Brown, 551 F. Supp. 2d 947, 950 (D. Ariz. 2008) (listing numerous cases recognizing "'the close relationship between drugs and firearms in the narcotics trade'") (citations omitted).

AO 72A
(Rev.8/82)

proceeds. Defendant's focus on the three specific incidents of drug activity at the business set forth in the affidavit ignores the remaining information in the affidavit provided by the confidential informants that Defendant operated the business as a front for the organization and as the location from which drugs were distributed and to which the proceeds of the sale of drugs were returned. [Doc. 304, Exh. A, Application, ¶¶ 9, 12-22]. Defendant also ignores the opinion of the affiant, who based on his experience and training, as well as involvement in this investigation, stated that drug traffickers (1) set up legitimate businesses to explain their wealth and use drug proceeds to finance these businesses; (2) use legitimate businesses as staging areas for drug trafficking and, in addition to other places, use these secure locations to store contraband, drug proceeds and records for easy access and concealment; and (3) keep large amounts of U.S. currency, "maintain books, records, notes, ledgers, money orders and other papers relating to the transportation, ordering, sale and distribution of drugs[,]" and possess firearms and various items of drug paraphernalia, such as for "packaging, cutting, weighing, and distributing illegal controlled substances[.]" [Id. ¶ 8]. These facts support a finding of probable cause for a broadly worded list of items to be seized.

And, given the nature of the crime being investigated, the list of the items to be seized, although broad and covering many categories of items, was sufficiently particular and not over-broad. See Prather, 279 Fed. Appx. at 766 (although the warrants "were broad with respect to their inclusion of all drug-related items[,]" due to the nature of investigation, drug trafficking linked to the residence, the court found "the scope of the warrants appropriately matched the scope of the police suspicion"); United States v. Harris, 903 F.2d 770, 775 (10th Cir. 1990) ("The type of criminal activity under investigation in the present case – a drug dealing business – makes it difficult to list with any greater particularity the books and records desired to be seized which evidences such activity."). Courts have found that items related to drug trafficking, such as, controlled substances; equipment and property used to further drug transactions; records relating to drug transactions and the laundering of drug proceeds; photographs and records of co-conspirators or objects of the criminal activity; proceeds, currency, valuables, and assets and records pertaining thereto, as well as to ownership of the location being searched; and firearms, fall within the scope of the probable cause established to search a location for evidence of drug related criminal activity and that such descriptions of the items to be seized are sufficiently particular given the nature of the crimes being investigated. See, e.g., United States v. Perry, 560

19

F.3d 246, 251-52 (4th Cir. 2009); <u>United States v. Timley</u>, 443 F.3d 615, 623 (8th Cir. 2006); <u>United States v. Riley</u>, 906 F.2d 841, 844-45 (2nd Cir. 1990); <u>United States v. Sullivan</u>, 919 F.2d 1403, 1424 & n.31 (10th Cir. 1990); <u>Smith</u>, 918 F.2d at 1507-08[4]; <u>United States v. Morisse</u>, 660 F.2d 132, 136 (5th Cir. Unit A 1981); <u>United States v. Royster</u>, 2007 WL 4336321, at *21 (M.D. Ga. December 7, 2007)[5]; <u>United States v. Smith</u>, 897 F. Supp. 1448, 1450-51 (S.D. Fla. 1995). The warrant for Alex Rims and Tires particularly described the items to be seized, and those items fell within the scope of the probable cause set forth in the affidavit to search the business for evidence of and related to drug trafficking criminal conduct.

---

[4]The court upheld a warrant authorizing the search for "'cocaine, documents, letters, photographs, business records, and other evidence relating to narcotics trafficking.'" <u>Id.</u> at 1507. The court stated, "Reasonably read, this language is directed to materials having a nexus to narcotics trafficking. We hold that this language meets the standards of practical accuracy that enable the searcher to ascertain and identify things authorized to be seized." <u>Id.</u> at 1507-08.

[5]In upholding the warrant, which authorized the seizure of "'cocaine, U.S. currency and all packaging, receipts, ledgers, documents, containers and proceeds derived from and used in the distribution of cocaine[,]'" the court found the items listed were "sufficiently detailed." <u>Id.</u> The court stated, "Considering that everyday items are commonly used in the distribution of drugs, the warrant described the items with as much particularity as possible." <u>Id.</u>

AO 72A
(Rev.8/82)

### b. Search Warrant for Emmy Tires

Defendant contends that the affidavit for the search warrant for Emmy Tires only establishes that illegal activity took place at Alex Rims and Tires and that the movement of tires between the businesses is not suspicious, given the nature of the businesses involved. He concludes that there is no nexus between the drug trafficking and laundering conduct and Emmy Tires established in the affidavit. [Doc. 304 at 4-5]. Defendant's arguments are not persuasive.

Although there is no direct evidence of criminal activity occurring at Emmy Tires, the affidavit sets forth sufficient circumstantial evidence to provide a link between Defendant's drug trafficking and the business for the Magistrate Judge to have concluded that "'there is a fair probability that contraband or evidence of a crime will be found in a particular place[,]'" that is, Emmy Tires. Jiminez, 224 F.3d at 1248 (citation omitted). It is well-settled that while the affidavit must establish a link between the defendant and the location to be searched as well as between the location and criminal activity, "[t]here need not be an allegation that illegal activity occurred at the location to be searched. . . ." United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009). "A suspect's home and business are the most obvious and natural location such materials to be likely located in the first instance." United States v.

Balance, 2008 WL 4533999, at *6 (D. Minn. October 6, 2008) (citing Wayne R. LaFave, Search and Seizure § 3.7(d), at 421-22 & nn.169-70 (4th ed. 2004)).

The affiant established that Defendant owned and operated Emmy Tires and that he and other members of the drug trafficking organization frequented that location. [Doc. 304, Exh. B, Application, ¶¶ 12, 17-18, 23]. The affiant also related the information provided by the confidential informant that Defendant intended to relocate some of his drug trafficking business from Alex Rims and Tires (and described the drug activity observed at that location, including concealing drugs in tires) "to an unspecified location around Jonesboro, GA, because he feared police attention." [Id. ¶¶ 12-16, 19]. The location of Emmy Tires is approximately 22 miles from Griffin, Georgia. [Id. ¶ 22]. Thereafter, agents conducted surveillance at Alex Rims and Tires and Emmy Tires. The affiant advised that agents observed "movement of large numbers of tires between" the two businesses and that those tires were "almost exclusively non-road-worthy," that is, "generally torn, shredded, and/or bald, and thus not suitable to be used on a vehicle." [Id. ¶¶ 19-20]. Agent Clark acknowledged that "standing alone" this information is neither "surprising or suspicious," but he stated that, based on his knowledge of the drug organization, that is, use of tires to transport drugs and drug proceeds, he believed that drugs or drug proceeds were being stored at

22

Emmy Tires.  [Id.].  Further, Agent Clark detailed surveillance of Emmy Tires over several months that "failed to show a volume of business even remotely likely to support the number of tires moved to and from the location" and stated that he knew "drug traffickers may try to cover their illegal activity using a front business."  [Id. ¶ 22].

The totality of the information relayed to the Magistrate Judge, considered in conjunction with the affiant's opinion based on his training, experience and involvement in this investigation, provided the necessary nexus between the illegal activity and Emmy Tires.  Reliance on the opinions and conclusions of trained and experienced law enforcement officers is appropriate.  See, e.g., United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (allowing agent to testify at trial as to methods of operation and drug codes); United States v. Cano, 289 F.3d 1354, 1361-64 (11th Cir. 2002) (allowing agent at trial to interpret hieroglyphics in drug ledgers); United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents regarding facts are properly considered in determining probable cause); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) (same); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983) (same).  Accordingly, based on the expertise and experience of officers and agents, contrary to Defendant's

argument, "even seemingly innocent activity may provide a basis for finding probable cause." <u>United States v. Dickey-Bey</u>, 393 F.3d 449, 454 (4th Cir. 2004) (citations and internal quotation marks omitted); <u>see also</u> <u>United States v. Sparks</u>, 291 F.3d 683, 688 (10th Cir. 2002) (the court found that, although the defendant's actions "could theoretically have been innocent, . . . a prudent, cautious and trained police officer more likely would have construed those actions" as involvement in the criminal activity under investigation); <u>United States v. Pena-Rodriguez</u>, 110 F.3d 1120, 1131 (5th Cir. 1997) (rejecting the defendant's contentions that his conduct was consistent with that of an innocent person, the court found the argument unavailing, noting that "[b]oth the Supreme Court and this circuit have recognized that 'innocent behavior frequently will provide the basis for a showing of probable cause'") (citations omitted).

### c. Good Faith

Finally, as the Government correctly argues, even if the warrant for Alex Rims and Tires was overly broad or if the affidavit for Emmy Tires did not establish probable cause, the evidence seized from these locations should not be suppressed because the good faith exception to the exclusionary rule should be applied in this case. [Doc. 314 at 9-10]. In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984), the Supreme Court established a

24

good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective. In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. <u>Id.</u> at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" <u>Id.</u> at 1480 (quoting <u>Leon</u>, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. <u>Id.</u> at 1481.

And, in the Eleventh Circuit, the good faith exception to the exclusionary rule applies to alleged violations of the breadth requirement. In <u>United States v. Travers</u>, 233 F.3d 1327 (11th Cir. 2000), the Eleventh Circuit Court of Appeals affirmed that the

25

good faith exception may be applied to an overly broad warrant.  Id. at 1330 (citing

Accardo, 749 F.2d at 1481); United States v. Lebowitz, 647 F. Supp. 2d 1336, 1355

(N.D. Ga. 2009).  However, the court stated that the exception is not applicable "if the

warrant is so overly broad on its face that the executing officers could not reasonably

have presumed it to be valid." Travers, 233 F.3d at 1330 (citing Accardo, 749 F.2d at

1481) ("The question here is not the legal validity of the warrant but the

reasonableness of the officers' reliance on it.  This is not an instance in which it is

plainly evident that a magistrate or judge had no business issuing a warrant[.]")

(citations and internal quotation marks omitted)).

The warrant for Alex Rims and Tires was not "so overly broad on its face" that

Agent Clark's reliance on the warrant was unreasonable.  Travers, 233 F.3d at 1330.

As discussed *supra*, the warrant's identification of the items to be seized, due to the

nature of the crimes being investigated, drug trafficking and laundering of drug

proceeds, and the pervasive use of the business to engage in that illegal activity, would

not have alerted a reasonable agent to be concerned about the validity of the Magistrate

Judge's authorization to search for the listed categories of items.

Additionally, the warrant for Emmy Tires was not "based on an affidavit 'so

lacking in indicia of probable cause as to render official belief in its existence entirely

26

unreasonable[.]'" <u>Leon</u>, 104 S. Ct. at 3421 (citation omitted). The court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in <u>Leon</u> found indicative of warrants falling within the third exception to the good faith doctrine. <u>See</u> <u>United States v. Glinton</u>, 154 F.3d 1245, 1257 (11th Cir. 1998). The affidavit included details about the affiant's training and experience and the reasonable conclusions drawn from the facts, about information related from confidential informants, and about surveillance conducted at the business. This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the Magistrate Judge. The affidavit provided factual details for the Magistrate Judge to consider and evaluate. The law enforcement officers were, therefore, entitled to rely upon his evaluation and determination that "given all the circumstances set forth in the affidavit before him, there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." <u>Gates</u>, 103 S. Ct. at 2332.

## III. Conclusion

For the foregoing reasons and cited authority, the court finds that the warrant for Alex Rims and Tires was not overly broad, that the affidavit for the warrant for Emmy Tires established probable cause for the search, and, in the alternative, that the good

faith exception applies in this case. Accordingly, the court **RECOMMENDS** that Defendant's motion [Doc. 264] to suppress evidence be **DENIED**.

### Defendant Juventino Baza's Motion to Suppress

Defendant Baza filed a motion to suppress contending that his warrantless arrest on April 2, 2010, was not supported by probable cause; therefore, he contends that the cellular telephone and currency seized from his person incident to arrest is not admissible in evidence. [Doc. 201]. Defendant also contends that an unidentified vehicle was searched at the scene of his arrest which resulted in the seizure of various documents that he seeks to suppress. [Id.]. However, the Government challenged Defendant's legitimate expectation of privacy in the unidentified vehicle, and Defendant is no longer challenging the seizure of evidence from any vehicle. [Docs. 300, 353]. Finally, Defendant seeks to suppress the evidence obtained from the aforementioned cellular telephone resulting from the execution of a search warrant signed by a Cherokee County Magistrate Court Judge on May 10, 2010. [Doc. 201, 303]. An evidentiary hearing was held on December 12, 2011, on Defendant's challenge to his warrantless arrest and seizure of the cellular telephone.[6] [Doc. 342].

---

[6]Citations to the hearing transcript are: (Tr. at ).

AO 72A
(Rev.8/82)

## I.    Warrantless Arrest & Seizure of Cellular Telephone

Defendant contends that, because the arresting officers did not have probable cause for the arrest, the cellular telephone seized from his person constitutes fruit of that unlawful arrest and evidence obtained from the cellular telephone should not be admitted at trial.  [Doc. 353].  The Government opposes the motion to suppress contending that based on the totality of the circumstances the arresting officers had probable cause to arrest Defendant and to conduct a search of his person incident to arrest.  [Doc. 357].

### a.    Background Facts

In April 2010, agents with the Georgia Bureau of Investigation ("GBI"), specifically Agent Kenneth Howard, Regional Assistant Special Agent-in-Charge and employed by the GBI for eleven years, were contacted by agents with the South Carolina Law Enforcement Division ("SLED") concerning a narcotics investigation being conducted by SLED.  SLED requested assistance with a controlled delivery of a quantity of cocaine in the Atlanta area.  (Tr. at 4-5).  On April 2, 2010, SLED Lt. Bradley Godfrey advised that a confidential informant ("CI") was brokering a drug deal for five kilograms of cocaine with the delivery of the drugs to the CI to take place in Marietta, Georgia.  (Tr. at 5).  SLED agents were monitoring telephone calls

between the CI and an individual known as "Pantera" (subsequently identified as Pablo Garcia) concerning the transaction. SLED agents conducted surveillance following the CI and Garcia from South Carolina to a restaurant, La Cabana, located on Highway 41, in Smyrna, Georgia. (Tr. at 5-6). SLED agents observed the CI and Garcia enter the restaurant. (Tr. at 6).

At that time, GBI assumed control of surveillance; however, SLED agents remained in contact with the CI, who as he was able made periodic telephone calls to the agents. (Tr. at 6-7, 21-23). Due to the fact that the area in which the restaurant was located was primarily Hispanic, Al Interiano, a Spanish speaking member of the Marietta-Cobb-Smyrna Narcotics Unit ("MCS"), entered the restaurant to conduct surveillance.[7] (Tr. at 6-8). Agent Interiano observed the CI and Garcia seated at a table with three Hispanic males engaged in conversation. (Tr. at 8, 18). When the CI was able to make telephone calls to SLED agents, he advised that the five kilogram drug transaction was being discussed, without any details as to specifics, and that one

---

[7]These events occurred during off-peak hours, and the restaurant was not crowded. (Tr. at 8).

of the men present was identified as the "Boss" and appeared to be in charge of the drug deal.[8]  (Tr. at 7, 9, 18-20).

Eventually, the five men left the restaurant.  The male identified as the "Boss" left in a vehicle with one of the other men who had been seated at the table and who was subsequently identified as Defendant Baza.  (Tr. at 8, 10, 17, 23-24).  The CI and Garcia left in a second vehicle, following "Boss" and Defendant Baza to a residence located at 2212 Old Springs Road.  The surveillance agents followed and parked as near to the residence as able to continue surveillance.  (Tr. at 8-10, 24).  Some of the agents exited their vehicles and established surveillance around the residence.  (Tr. at 9).  Inside the residence, the CI, who relayed this information as he was able to make telephone calls to SLED agents, was shown one kilogram of cocaine as a sample, and he requested that the remaining four kilograms be delivered to the residence.  (Tr. at 9-10).  The CI also advised that one of the Hispanic males, not Defendant Baza, then left in a red truck to obtain the cocaine.  (Tr. at 10).  When the drugs arrived, the CI was supposed to contact a friend to bring $100,000 to pay for the five kilograms.  (Tr. at 12-13).

---

[8]This is co-Defendant Bernaldo Molina-Cardenas.  [Doc. 357 at 3 n.2].

AO 72A
(Rev.8/82)

Agents followed the red truck to another residence, 2421 Sara Drive, Cobb County. At approximately the same time as the truck, a taxi arrived at the Sara Drive residence. (Tr. at 10). After a short time, both vehicles left the residence. (Tr. at 10). A taxi matching the one at 2421 Sara Drive subsequently arrived at the Old Springs residence; although, the red truck drove to the area of the residence, it did not return to the residence. (Tr. at 10-11). The surveillance agents observed the truck circling the area with no apparent destination, pulling into the parking lots of commercial establishments but the driver did not exit, and then circling the area again while the driver was speaking on a cellular telephone. (Tr. at 11). The agents believed the driver, subsequently identified as Eleazar Rivera, was conducting counter surveillance for the drug transaction at the residence. (Tr. at 11, 16).

Because the CI remained in the residence and would soon have to produce the buy money and due to the concerns that the driver of the red truck would discover the law enforcement presence, agents were directed to secure the premises and the occupants of the residence while a search warrant was being obtained. (Tr. at 12-14). At approximately 4:00 p.m., six to eight agents entered the premises while eight agents remained on the perimeter. (Tr. at 14). Defendant Baza was located standing with another Hispanic male just outside the back basement door of the residence, and just

32

inside, two individuals were found apparently conducting the drug transaction. (Tr. at 15, 16-17, 26, 28). When the search warrant was obtained at 4:27 p.m., agents executing the warrant found the five kilograms of cocaine in the area where the two men had been standing which was immediately to the left of the aforementioned basement door.[9] The cocaine was secured in a western cowboy-style boot box. (Tr. at 14-15, 27). Based on all of these facts, the agents "felt like there was no real reason for [Defendant] Baza to be standing at that location [just outside the basement door] other than as a lookout or security to vet whoever was coming or going out of that door." (Tr. at 27, 20).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress.

**b.      Discussion**

As noted, Defendant Baza contends that the agents lacked probable cause for his arrest asserting that the facts establish that he was merely present at 2212 Old Springs Road on April 2, 2010. [Doc. 353]. The Government opposes the motion to suppress

---

[9]The basement was unfinished, with wall studs but otherwise open. The area where the drugs were located appeared to be used as a bedroom as there was a mattress on the floor and a dresser. (Tr. at 15, 27).

33

arguing that the totality of the circumstances establish probable cause for Defendant's arrest. [Doc. 357].

In <u>Ybarra v. Illinois</u>, 100 S. Ct. 338 (1979), the Supreme Court stated that "a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person." <u>Id.</u> at 342 (citing <u>Sibron v. New York</u>, 88 S. Ct. 1889, 1902 (1968)) (emphasis added). The Court further explained, "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." <u>Id.</u> And, in <u>Craig v. Singletary</u>, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment," . . . "probable cause itself is a doctrine of reasonable probability and not certainty[.]"

<u>Id.</u> at 1042 (citations omitted); <u>see also</u> <u>United States v. Lindsey</u>, 482 F.3d 1285, 1291 (11th Cir. 2007) ("Probable cause to arrest exists when the totality of the facts and

AO 72A
(Rev.8/82)

circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'") (citation omitted). Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity, . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances." United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (citations omitted). Those circumstances and inferences must also be judged taking into account the experiences and opinions of trained law enforcement officers on the scene. See, e.g., Dickey-Bey, 393 F.3d at 454; Sparks, 291 F.3d at 688; Pena-Rodriguez, 110 F.3d at 1131; Robinson, 62 F.3d at 1331 n.9.

The facts before this court provide the "more" required by the Supreme Court, especially in light of the agents' opinion as to Defendant's role at the residence, to establish that Defendant was not merely present at the residence coincidentally as a five kilogram drug transaction was taking place. First, Defendant was not only present at the residence but he was also present with four other men at the restaurant seated at a table where the drug transaction to take place later that day was being discussed. (Tr. at 7-9, 17-20). Defendant's contentions that there were no details as to what was said, that there may have been separate discussions taking place, or code words used do not

35

undermine the reasonableness of the agents' reliance on the fact that he was observed seated at the table with only four other men as the drug deal was discussed to conclude that he was a knowing participant. Second, Defendant did not just happen to be at the restaurant as he left with the "Boss" and returned to the location for the drug deal, the residence at 2212 Old Springs Road. (Tr. at 9-10, 17, 23-24). He was at the residence during the drug transaction, that is, while the CI examined the sample and the four additional kilograms of cocaine were ordered and delivered. (Tr. at 9-11). And Defendant was found standing immediately outside the basement door while five feet inside that door, in the unfinished basement, others involved in the drug deal were standing with the five kilograms of concealed cocaine. (Tr. at 15, 20, 26-28). The court finds credible and reasonable the agents' conclusion that "there was no real reason for [Defendant] Baza to be standing at that location [just outside the basement door] other than as a lookout or security to vet whoever was coming or going out of that door." (Tr. at 20, 27). These facts establish probable cause to believe that Defendant was a participant in the drug transaction.

In United States v. Darensbourg, 236 Fed. Appx. 991 (5th Cir. 2007), the Fifth Circuit Court of Appeals, distinguished Ybarra and found that the evidence established probable cause to arrest the defendants, one of whom was found seated in a residence

36

with the second defendant, the home owner, playing video games when the police arrived.  The police, who had been conducting surveillance of the residence, had just arrested a person leaving there and had seized a large quantity of drugs and a firearm from that person.  They then received consent from the defendant home owner to search the residence.  Id. at 993-94.  In upholding the pat down of the defendants, the court noted that unlike the situation in Ybarra, involving searches of the patrons of a bar where a search warrant was executed, "occupants of a house generally have a closer relationship, and it is not unreasonable to think their relationship might extend to involvement in illegal activities."  Id. at 994.  "Based on [the fact of the defendants' presence in the residence from which a person carrying drugs and a firearm had just left, the court concluded that] reasonable officers could believe that [the defendants] could also have been involved in drug trafficking. . . ."  Id.; see also United States v. Reid, 997 F.2d 1576, 1579 (D.C. Cir. 1993) ("There is more reason to suspect that an individual who is present in a private residence containing drugs is involved in illegal drug activity than someone who merely holds conversations with drug addicts in public places.").

And, in United States v. Valencia-Amezcua, 278 F.3d 901 (9th Cir. 2002), the Ninth Circuit Court of Appeals rejected a defendant's argument that he was merely

AO 72A
(Rev.8/82)

present at a residence when a consent search uncovered a hidden methamphetamine laboratory.  Id. at 906-07.  The defendant was located in a bedroom in the residence seated on a bed with other individuals that "may have been placed" just in front of a door "to obscure the door" that lead to a secret room containing the laboratory.  Id. Noting that an agent's experience and training "may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer[,]" the court found reasonable the agents' assessment that the laboratory required several people to operate and that the defendant's "proximity to the hidden door and his seated position with others on a bed, blocking entrance to the secret room, suggested that [he] had participated in the methamphetamine lab's activities and perhaps had exited the lab before the officers' arrival."  Id. at 906-07 (citations and internal quotation marks omitted).

Similarly, in this case, Defendant was found in a residence - or just outside the door of a residence - where immediately inside that door a five kilogram drug deal was taking place, and he appeared to the agents at the location to be acting as a lookout or providing security for the drug transaction.  In this regard, the court concludes that it is highly unlikely that the "Boss" would discuss in a group of five people and then conduct a $100,000 drug deal with someone present who did not have his trust and

38

confidence. <u>See</u> <u>United States v. Perry</u>, 747 F.2d 1165, 1169 (7th Cir. 1984) (rejecting the defendant's mere presence claim during a drug transaction which the conspirators believed was worth a million dollars, the court stated that "it strikes us as incredible that Robert Lewis would have a person accompany him to a drug deal . . . where that person did have Lewis's utmost trust and confidence"); <u>United States v. Traylor</u>, 2009 WL 87470, at *3 (W.D. N.Y. January 12, 2009) (finding probable to arrest the defendant found in an apartment apparently used for drug transactions due in part to the conclusion that access to such a location would be limited because "the drug dealer or dealers using the apartment would presumably take pains to ensure that only persons whom they trust could actually enter the apartment . . ."), <u>aff'd</u>, 396 Fed. Appx. 725 (2nd Cir. 2010); <u>Kilgore v. The City of Stroud, Oklahoma</u>, 2004 WL 2203477, *4 (W.D. Okla. August 16, 2004) (Noting that it was unlikely that the owner of the precursor chemicals and other items would allow an innocent person to observe the illicit conduct, the court stated, "If Mr. Kilgore were innocent, Mr. Lewis' allowing Mr. Kilgore to observe what he did and to have access to the items he did would be unusual because Mr. Kilgore would then be able to furnish evidence against Mr. Lewis regarding the purchase and possession of the pseudoephedrine and the needles and syringes.").

AO 72A
(Rev.8/82)

Because Defendant was lawfully arrested, the court finds that the seizure of the cellular telephone and any currency from Defendant's person as the result of a search incident to lawful arrest are admissible into evidence. See United States v. Robinson, 94 S. Ct. 467 (1973); Chimel v. California, 89 S. Ct. 2034 (1969); United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002).

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 201] to suppress the evidence seized from his person on April 2, 2010, be **DENIED**.

## II.     Search Warrant for Cellular Telephone

Defendant also contends that the court should suppress the evidence obtained from the search of the cellular telephone seized from his person contending, rather summarily, that (1) the affidavit was not supported by probable cause; (2) the affidavit contained a material misrepresentation or false statement in reckless disregard of its truth; (3) the affidavit failed to provide a nexus between the cellular telephone and the contents sought or between the telephone and the alleged undercover transaction; (4) the affidavit failed to establish the CI's reliability; and (5) the warrant was overbroad and lacked particularity in describing the items to be seized. [Doc. 201, ¶ 7]. The Government opposes the motion to suppress contending that the affidavit did establish probable cause and a nexus between the unlawful activity and the contents of the

40

cellular telephone; that the affidavit did establish the CI's reliability; that Defendant failed to establish that the affidavit contained material and intentional falsehoods; and that the warrant was not overly broad with respect to the items to be seized. [Doc. 322].

### a. Background Facts

On May 10, 2010, GBI Agent Brian Vessels appeared before a Cherokee County Magistrate Judge and obtained a search warrant for a number of cellular telephones seized on April 2, 2010, during the execution of search warrants at 2421 Sara Drive, Marietta, Georgia, and at 2212 Old Springs Road, Smyrna, Georgia. [Doc. 322, Ex. A, Search Warrant & Affidavit]. Among the cellular telephones seized was the cellular telephone taken off Defendant Baza's person after his arrest. [Id.]. The magistrate judge authorized the telephones to be searched for "[a]ny and all information including but not limited to all electronic data, files, and other electronic information located within the above described cellular telephone." [Id., Attachment II]. After providing a listing of the type of electronic data and software to be accessed, the following limiting provision was included: "Any and all evidence contained therein connected with the distribution and/or financing of illicit drug trafficking." [Id.]. A separate

41

sentence also provided for the seizure of: "Any, and all, other material which is evidence of a Violation of the Georgia Controlled Substances Act." [Id.].

In the attached affidavit, Agent Vessels ("Affiant") provided details about his law enforcement experience and training. [Doc. 322, Ex. A, Search Warrant & Affidavit, Attachment III]. Affiant advised that he had extensive experience with drug trafficking investigations and interaction with other investigators which had given him "the knowledge and insight to recognize the methods used by narcotics traffickers and money launderers to conceal their drugs, assets, income and overall activities from law enforcement personnel and other persons." [Id.]. Based on his training and experience, the Affiant stated that he believes drug traffickers maintain various records and documents regarding the acquisition and distribution of drugs and assets and that they "maintain addresses or telephone numbers (sometimes stored electronically within cellular telephones carried by drug traffickers). . . ." [Id.]. He finally opined that "drug traffickers attempt to conceal their methods of communication through the use of electronic devices ranging from police scanners, cellular telephones, and digital paging devices to sophisticated transmitter detection equipment, all of which is utilized to protect their enterprise." [Id.].

42

In support of probable cause to search the seized cellular telephones, Affiant summarized the seizures from the residences on Sara Drive and Old Springs Road on April 2, 2010, which included the arrest of six individuals and the seizure of five kilograms of cocaine and a number of cellular telephones at Old Springs and eight kilograms of cocaine, three pounds of methamphetamine, three firearms and $188,000, and cellular telephones at Sara Drive. [Id., ¶¶ 1-4]. Affiant stated that during the controlled narcotics transaction between the CI and the defendants, "[d]ocumented use of the cellular telephonic devices as well as corroborated surveillance observations by Agents confirmed that the cellular telephones were used to organize, manage, and execute this narcotics transaction by all parties involved." [Id., ¶ 5].

b. **Discussion**

The court fully set out *supra* the analysis applied to test the sufficiency of the probable cause in the affidavit for the search warrant. As discussed, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Jiminez, 224 F.3d at 1248 (citation omitted). And, in reviewing such a finding, the undersigned

43

determines only whether the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331.

After taking into account the challenges to the affidavit set forth by Defendant, the court finds that the affidavit for the warrant to search the contents of Defendant's cellular telephone established probable cause.  The Eleventh Circuit Court of Appeals, in considering the nexus between a residence and seeking evidence of the crimes under investigation, has stated:

> Probable cause to search a residence requires some nexus between the premises and the alleged crime. . . .  "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." . . . We have previously found that a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause.

United States v. Bradley, 644 F.3d 1213, 1263-64 (11th Cir. 2011) (quoting United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (citation and alteration omitted)).  The same reasoning applies to the instant search warrant in determining whether the affidavit establishes a nexus between the contents of the cellular telephone and the drug transaction for which Defendant was arrested.  The affidavit need not establish direct observation of use of the cellular telephone to facilitate the drug

44

transaction; instead, the "fair probability" that the contents of the cellular telephone may contain evidence of the crime may be established from the affiant's "expectation, based on prior experience and the specific circumstances of the alleged crime[.]" Id. at 1263.

In the affidavit, after he outlined his training and experience, which formed the basis for his "knowledge and insight to recognize the methods used by narcotics traffickers and money launderers to conceal their drugs, assets, income and overall activities from law enforcement personnel and other persons[,]" the Affiant stated that he believes drug traffickers maintain various records and documents regarding the acquisition and distribution of drugs and assets, that they "maintain addresses or telephone numbers (sometimes stored electronically within cellular telephones carried by drug traffickers)" and that "drug traffickers attempt to conceal their methods of communication through the use of electronic devices ranging from police scanners, cellular telephones, and digital paging devices to sophisticated transmitter detection equipment, all of which is utilized to protect their enterprise." [Doc. 322, Ex. A, Search Warrant & Affidavit, Attachment III]. The Affiant then summarized the evidence seized from the two residences on April 2, which included large amounts of drugs, currency and cellular telephones and which resulted in the arrest of six

45

individuals who were believed to be involved in a controlled drug transaction with a CI. As part of that narcotics transaction between the CI and the defendants, the Affiant stated that "[d]ocumented use of the cellular telephonic devices as well as corroborated surveillance observations by Agents confirmed that the cellular telephones were used to organize, manage, and execute this narcotics transaction by all parties involved." [Id., ¶¶ 1-5]. This information establishes not only the Affiant's belief that evidence of the drug trafficking crimes will be found in the cellular telephones seized on April 2 but provides the necessary link between the cellular telephones and the controlled delivery of cocaine.

Defendant contends that some of this information, specifically that obtained from the CI and concerning use of the cellular telephones on April 2, is not reliable and not truthful and, therefore, should not be considered by the court in evaluating probable cause. "If an informant is mentioned in the affidavit, the affidavit must demonstrate the informant's 'veracity' and 'basis of knowledge.'" United States v. Johnson, 444 Fed. Appx. 424, 425 (11th Cir. 2011) (quoting Gates, 103 S. Ct. at 2332). "However, '[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.'" Id. (quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)). Although the use of

46

a CI is mentioned in the affidavit, there is no information specifically attributed to the CI that the magistrate judge was asked to rely upon in issuing the warrant. The affidavit only states that, "On Friday, April 2, 2010, Agents utilized a Confidential Reliable Source (CRS) to facilitate a controlled narcotics transaction between CRS and defendant(s)." [Doc. 322, Ex. A, Search Warrant & Affidavit, Attachment III, ¶ 5]. This statement does not require the magistrate judge to evaluate the veracity of the CI - the statement is made by the Affiant.

And, if the affidavit is read to infer that information provided by the CI is included within the "[d]ocumented use of cellular telephonic devices" referenced in the next sentence to establish that the seized cellular telephones were used during the drug deal, then the court finds that there is sufficient independent corroboration of this CI's information in the affidavit to establish veracity. The fact that a controlled delivery was set up by the CI on that day with the defendants, who were found and arrested at the two locations where substantial quantities of drugs and currency were discovered, demonstrates veracity. See United States v. Hawkins, 278 Fed. Appx. 629, 634-35 (6th Cir. 2008) (although affidavit did not contain information about the CI's reliability, the necessary independent police corroboration of the CI's veracity is provided by controlled buy of drugs); United States v. Bramlett, 232 Fed. Appx. 940,

47

943 (11th Cir. 2007) ("without the statements in the affidavit regarding the CI's past reliability, there was a monitored controlled buy and 'sufficient independent corroboration of [the] informant's information,' and, thus, no need to prove the CI's reliability") (citation omitted); United States v. Graham, 2006 WL 890661, at *4 (M.D. Fla. April 6, 2006) ("contrary to Defendant's argument, there was no need to establish the CI's veracity in the affidavit because the controlled buy was an independent corroboration of the CI's credibility"); and see United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (corroborating evidence gathered by officers can provide indicia of reliability).

And Defendant has failed to establish that the affidavit contained intentionally or recklessly made material false statements. See Franks v. Delaware, 98 S. Ct. 2674 (1978). In Franks, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. Franks, 98 S. Ct. at 2684-85; see also United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009).

48

To mandate a <u>Franks</u> evidentiary hearing,

the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

<u>Franks</u>, 98 S. Ct. at 2684-85; <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1267 (11th Cir. 2001) ("[T]o prevail in a <u>Franks</u> challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant.") (citation omitted).

49

The only assertion that Defendant raises in support of the <u>Franks</u> challenge is:

The affidavit stated that "**Documented** use of cellular telephonic devices as well as corroborated surveillance observations by Agents **confirmed** that **the cellular telephones were used** to organize, manage, and execute **this narcotics transaction** by all parties involved." (emphasis added) The Government has yet to produce any discovery documenting that Defendant Baza's phone was used for the alleged undercover transaction. . . . The Court's attention is invited to the fact that this case arose from a Title III wiretap of the phones of several co-defendants, and as such, the Government would have been well aware by May 10, 2010, whether or not there was documented confirmation of the use of Defendant Baza's phone to organize, manage and execute this particular narcotics transaction.

[Doc. 201, ¶ 7b., n.1]. Defendant apparently argues that the only documentation possibly showing use of Defendant's cellular telephone on April 2, 2010, would have to be through the Title III intercepted conversations. As the Government points out, that is not necessarily the case. [Doc. 322 at 6]. And, if that "documentation" is found in statements or information provided by the CI or other participants, the fact that there is no recording of Defendant using his cellular telephone on April 2, 2010, does not demonstrate an intentional or reckless falsehood in the affidavit. The court also finds that, if the evidence established that only some of the cellular telephones on April 2, 2010, were used to facilitate the drug transaction - and obviously some telephones had

50

to be used[10] - then at most the Affiant should have said one or more or some of the parties involved in the transaction used cellular telephones not "all parties involved." The court does not find that, if this alterative language should have been used in the affidavit, this fact either (1) evidences deliberate or intentional or even reckless inclusion of a false statement or (2) would have negated probable cause. See O'Ferrell, 253 F.3d at 1267. The fact that one or more of the participants made use of such devices, just as the Affiant opined that his training and experience would lead him to believe, substantiated the "probability" that all of the cellular telephones seized would contain evidence.

Reliance on the Affiant's opinion about use of these devices and the information contained therein is sufficient for finding a nexus between the drug transaction and evidence of that crime. See Robinson, 62 F.3d 1331 n.9; Magluta, 44 F.3d at 1535 (same); Espinosa-Orlando, 704 F.2d at 511 (same). In United States v. Wiseman, 158

---

[10]In fact, based on evidence introduced at the hearing, the court is aware that the driver of the red truck, who left 2212 Old Springs Road and traveled to 2421 Sara Drive, arriving at the same time as the taxi subsequently seen arriving back at the Old Springs residence presumably with additional kilograms of cocaine, was observed by surveillance agents using a cellular telephone while conducting counter surveillance. (Tr. at 10-11). The reasonable inference being he was communicating with someone at the Old Springs residence. Also, to coordinate the delivery of the additional cocaine, the reasonable inference is that individuals at one or both residences had to use telephones.

51

F. Supp. 2d 1242 (D. Kan. 2001), the district court rejected an attack on probable cause to search the contents of a cellular telephone of a defendant who had been arrested for the manufacture of methamphetamine. <u>Id.</u> at 1249. The affidavit in that case set out the affiant's training and experience and included his opinion that "drug dealers commonly store information relating to their associates in their cellular phones." <u>Id.</u> The court stated, "Defendant asks the court to feign ignorance of what has become common knowledge in the courts, i.e., that cellular phones, complete with memory of numbers recently or frequently called, or their 'address books,' are a known tool of the drug trade." <u>Id.</u> (citing <u>United States v. Nixon</u>, 918 F.2d 895, 900 (11th Cir.1990); <u>United States v. Hernandez</u>, 1999 WL 318090, at *13 (D. Kan. February 23, 1999); <u>United States v. Hernandez</u>, 1999 WL 183886 (D. Kan. March 9, 1999)); <u>and see Lisbon</u>, 2011 WL 6014453, at *24 ("the Eleventh Circuit and numerous other federal appellate courts recognize that cell phones are 'a known tool of the drug trade'") (citations omitted). Accordingly, even if the statement that "*all* parties involved" used cellular telephones on April 2, 2010, is not considered by the court, the affidavit still establishes probable cause.

Defendant also contends that the search warrant lacks particularity and specificity in the items to be seized, noting that the warrant specifies the seizure of

52

"any and all information" in the cellular telephone.  [Doc. 201, ¶ 7.f.].  "'Particularity is the requirement that the warrant must clearly state what is sought.'"  Maali, 346 F. Supp. 2d at 1239 (citation omitted).  Although "[a] description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized[,]" United States v. Wuagneux, 683 F.2d 1343, 1348 (11th Cir. 1982), the particularity requirement must be enforced to avoid undermining the warrant requirement and to decrease the risk of allowing excessive intrusion into personal rights protected by the Fourth Amendment, id. at 1348-49.  See also United States v. Thornhill, 20 F. Supp. 2d 1377, 1379 (M.D. Ga. 1998) ("Elaborate specificity in a warrant is not necessary.  A description is sufficiently particular when it enables a searcher to reasonably ascertain and identify the items authorized to be seized.").

However, because the circumstances of an investigation "often make an exact description impossible[, ]. . . the judicial officer issuing the warrant must weigh the practical necessities of law enforcement against the likelihood of a violation of personal rights of the one whose possessions are to be searched." United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985) (citing United States v. Cook, 657 F.2d 730, 733 (5th Cir. Unit A 1981)).  In this regard, "[i]t is universally recognized that the particularity requirement must be applied with a practical margin of flexibility,

depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." Wuagneux, 683 F.2d at 1349.

In making this argument, Defendant ignores the rest of the identification of the property to be seized, that is, the limitation in the last sentence of the provision cited by Defendant: "Any and all evidence contained therein *connected with the distribution and/or financing of illicit drug trafficking*." [Doc. 322, Ex. A, Search Warrant & Affidavit, Attachment II] (emphasis added). Defendant also fails to point out that the property to be seized authorization includes the limitation, "Any, and all, other material which is evidence of a Violation of the Georgia Controlled Substances Act." [Id.]. Given the fact that the search involves a cellular telephone associated with a suspected drug trafficker, these statements provide sufficient particularity, for the individual searching the cellular telephone, to identify what to look for and to limit the search and seizure to items that may constitute evidence of the crime under investigation. In United States v. Guerrero, 2008 WL 2549010 (D. Kan. June 24, 2010), the district court found that a search warrant was sufficiently particularized in authorizing the search of a cellular telephone's entire memory. Id., at *4. The only concern that the court expressed was the failure in the warrant "to limit the search of the telephone to

54

evidence of a specific . . . crime." Id. (citing United States v. Riccardi, 405 F.3d 852, 862 (10th Cir. 2005) (noting that in authorizing searches of computers such a limitation, or a limitation to specific types of materials, were required to pass the particularity test)). The court, however, noted the difference in the amount and nature of information that is stored on a telephone as compared to a computer and found that "the warrant is not overbroad in recognizing the fair probability of finding relevant evidence of drug trafficking contacts and communications in all segments of the phone's memory and data." Id. Finally, the court found, that even absent the limitation in the search warrant to drug trafficking evidence, there was in all likelihood no impact on the scope of the search. The court concluded, "While the better practice would have been for the warrant on this cellular telephone to have expressly referenced the federal crime of drug trafficking, the court finds nothing to indicate that the search and seizure of evidence from the cellular telephone exceeded the lawful drug trafficking scope of the warrant." Id. As noted, the warrant in this case did limit the search of Defendant Baza's cellular telephone's contents to evidence of drug trafficking or the financing of those activities. [Doc. 322, Ex. A, Search Warrant & Affidavit, Attachment II]. And Defendant has failed to point out any items seized that he contends exceeded the lawful scope of that search.

55

For the reasons stated, the court **RECOMMENDS** that Defendant's motion [Doc. 201] to suppress the evidence obtained from execution of the search warrant for the contents of his cellular telephone be **DENIED**.[11]

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Baza's motion [Doc. 201] to suppress be **DENIED**.

### Defendant Gregory Harrison's Motion to Suppress

Defendant Harrison moves to suppress evidence seized pursuant to the execution of a search warrant for his residence, 1724 Brandon Lee Way, on September 8, 2010, authorized by a Judge of the Superior Court of Cobb County, and evidence seized as the result of a warrantless search of that residence and his Cadillac Escalade on January 20, 2011. [Doc. 272]. The Government opposes the motion to suppress. [Docs. 313, 335].

---

[11]With respect to the particularity arguments, the Government also relied on the good faith exception to the exclusionary rule. [Doc. 322 at 8-9]. The court need not address the Government's alternative argument having found that the warrant provided sufficient particularity but notes that the Government's contentions on this issue are valid.

AO 72A
(Rev.8/82)

# I.    September 8, 2010, Search Warrant

With respect to the search pursuant to the Cobb County Superior Court warrant for his residence, Defendant raises three challenges to the finding of probable cause for the search: that the affidavit for the warrant contains two false material statements, made intentionally or with reckless disregard for the truth; that the affidavit omits material information intentionally or with reckless disregard for the truth; and that the affidavit does not contain information establishing the veracity and reliability of the confidential informant.[12] [Doc. 366]. The Government opposes the motion to suppress contending that the one statement that is admittedly false in the affidavit was not included intentionally or with reckless disregard for the truth, that Defendant failed to establish that any other statements in the affidavit were false, that the information omitted from the affidavit was not material to the probable cause determination, and that the information contained in the affidavit established the veracity of the confidential informant.    [Doc. 313 at 9-17; Doc. 373].    In the alternative, the Government contends that the good faith exception is applicable to this case. [Doc. 373 at 26-27].

_____

[12]Defendant had initially raised additional challenges to the search warrant but withdrew those after the first round of briefs filed by the parties. [Docs. 272, 313, 330 at 13-14].

AO 72A
(Rev.8/82)

### a.     Franks - False Statements

The court previously set forth the analysis applicable to reviewing the issuing judge's determination that the affidavit offered in support of the search warrant establishes probable cause and the showing that a defendant must make to mandate a Franks hearing. See Upton, 104 S. Ct. at 2085; Gates, 103 S. Ct. at 2333-32; Franks, 98 S. Ct. at 2684-85. As the court noted *supra*, a Franks hearing is mandated (1) if the defendant makes a substantial preliminary showing that a false statement made knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit and (2) if the allegedly false statement was necessary to the finding of probable cause. Franks, 98 S. Ct. at 2684-85. Defendant contends that these two statements included in the affidavit are false:

> During the operation [on June 22, 2010,] a black Lexus (ASM9357) arrived at the house and backed into the garage. Once inside the garage, the garage door was immediately shut concealing the vehicle. Approximately twelve (12) minutes later, the Lexus left the location.

[Doc. 306 at 1, quoting Search Warrant Affidavit at SW103629-000003 (Gov't Ex. 1)].

> At approximately 1200 hours [on September 8, 2010], the red Toyota Tacoma (BDH9875) arrived at the target location and pulled into the garage. Almost immediately the garage doors were shut, concealing the vehicle. . . . At approximately 1222 hours the 1995 Toyota Tacoma left the target location and returned to the original business location. . . . At

58

approximately 1250 hours the 2007 Cadillac Escalade (Alabama tag 38b23k2) left the target location.

[Id. at SW103629-000004-SW103629-000005]. The location where these two events took place is Defendant's residence - the location sought to be searched, and each incident allegedly involved a drug transaction. [Id. at SW103629-000003-SW103629-000005].

As to the June 22, 2010, alleged transaction, Defendant contends that because two vehicles were already parked in his residence's two-car garage, the statement that the black Lexus backed into the garage "is not true because it is impossible." [Doc. 306 at 2]. In support of that factual contention, Defendant offered his affidavit and the affidavits of his mother, Dorothy Mitchell, and his step-father, Rawle Mitchell. [Doc. 306, Exs. B, C, D]. Those affidavits established that two vehicles were parked in the garage at the time of the events alleged in the affidavit making it, as Defendant contended, impossible for any other vehicle to have entered the garage as set forth in the affidavit. Defendant contends that the false statement was material because, after the Lexus allegedly left his residence, a traffic stop was conducted and a kilogram of cocaine was seized from the vehicle - the inference being that the drugs were obtained from his residence - an inference no longer plausible if the false statement is stricken

59

from the affidavit. [Doc. 306 at 2]. The Government now concedes that the part of the affidavit that states that the black Lexus "backed into the garage" is false, however, contends that inclusion of that statement was neither intentional nor made with reckless disregard for the truth. The Government further contends that, even if that phrase is stricken from the affidavit, the remaining information establishes probable cause. [Doc. 373 at 1, 13-14].

For the September 8, 2010, alleged transaction, Defendant asserts that the statement that the Toyota truck entered his garage is also impossible because his vehicle was parked in the garage and he "believes . . . although frankly [he] cannot be sure of this" that another vehicle, a BMW, was also parked in the garage. [Doc. 306 at 3, Ex. D ¶ 4]. However, Defendant asserted in his affidavit that, even if the second vehicle was not parked in the garage, while he was at the residence that day, "no vehicle pulled into the garage" because he "should have heard the garage door opening and closing if any vehicle had pulled into the garage[,]" and he did not hear such a noise. [Doc. 306 at 3-4, Ex. D ¶4]. Defendant contends that this false statement is material because the affiant linked the events of June 22 and September 8 to establish that a drug transaction had occurred on both occasions at Defendant's residence establishing probable cause to search. [Doc. 306 at 4]. The Government responded

that Defendant is not a credible witness based on the evidence presented at the hearing, that the Toyota truck did arrive and enter his garage that day, and that there is no false statement in the affidavit regarding the September 8 alleged drug transaction. [Doc. 313 at 13-14; Doc. 373].

After reviewing Defendant's supplemental submission on the alleged inclusion in the affidavit of the two material false statements and whether probable cause was still established if both of those statements were stricken from the affidavit and after considering the Government's arguments in opposition to setting a <u>Franks</u> hearing, the court found that Defendant had made a substantial preliminary showing and held a hearing on March 23, 2012, on Defendant's <u>Franks</u> motion on these two allegedly false statements.[13] [Doc. 363]. Before setting out the facts found credible by the court from hearing the evidence presented by Defendant and the Government, the court will outline the law guiding the court's resolution of this issue.

### 1.    Legal Standard

In <u>Franks</u>, the Supreme Court summarized the showing that must be made by a defendant when a hearing is held:

---

[13]Citations to the evidentiary hearing transcript are:  (Tr. at ).

> In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

98 S. Ct. at 156; accord United States v. Harris, 172 Fed. Appx. 950, 958 (11th Cir. 2006) (same). And, "in conducting a Franks analysis, the court will 'hold the government accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit.'" United States v. Ohoro, 724 F. Supp. 2d 1191, 1200-01 (M.D. Ala. 2010) (citation omitted). "Reckless disregard for the truth in this context occurs where a government agent or instrumentality harbored or should have harbored serious doubts about the truth of a statement but made the statement anyway." O'Ferrell v. United States, 32 F. Supp. 2d 1293, 1301 (M.D. Ala. 1998) (citation omitted); accord United States v. Gonzalez, 2010 WL 2721882, at *13 (N.D. Ga. May 25, 2010) (same). "Additionally, [r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations." Gonzalez, 2010 WL 2721882, at *13 (citations and internal quotation marks omitted). However, the mere fact that a

AO 72A
(Rev.8/82)

statement was incorrect "does not render the statement perjurious or in reckless disregard for the truth." Id., at *12.

## 2. Background Facts

On September 8, 2010, at 5:10 p.m., Affiant C.J. Wagner, an agent with the Cobb County Police Department, assigned to MCS, presented a search warrant and sworn affidavit to a Cobb County Superior Court Judge, who signed the warrant authorizing a search of Defendant's residence, located at 1724 Brandon Lee Way, in Cobb County. (Gov't Ex. 1). In the affidavit, after setting forth his extensive training and experience in investigating organized criminal groups, including drug trafficking organizations, the Affiant stated that he "was familiar with the ways in which drug dealers conduct their business, including the various means and methods by which drug dealers sell, and distribute drugs, their use of telephones and computers to facilitate drug activity, and the means and methods of concealing and using assets." (Gov't Ex. 1, Search Warrant, Affidavit at SW103629-000003).

The Affiant then outlined the basis for the search of Defendant's residence beginning with the events on June 22, 2010. MCS agents were conducting surveillance at Defendant's residence based on information that a drug deal would take place there that day. During this time, the black Lexus arrived at Defendant's

63

residence and backed into the garage.  The Affiant further stated that, after the Lexus left the residence twelve minutes later, a traffic stop was conducted, and 2.52 pounds of powder cocaine was seized from the Lexus.  (Id.).

The Affiant then outlined information received on September 8, 2010, from a confidential informant ("CI") who advised that a kilogram of cocaine was to be delivered to Defendant's residence.  The CI advised that several Hispanic males, coming from an identified local business would deliver the cocaine.  The CI specified that a maroon Chevrolet Astro van, driven by a short Hispanic male with dark hair, would arrive at the specified business to pick up the cocaine and would then proceed in another vehicle with one or more Hispanic males to Defendant's residence.  At the residence, the CI advised that the vehicle would enter the garage, that the garage door would close and that the transaction would be conducted.  Afterwards, the vehicle with the Hispanic males would leave returning to the business.  (Id. at SW103629-000004).

The surveillance conducted thereafter was set forth in the affidavit advising that the agents observed the maroon Chevrolet Astro arrive at the business, observed the short Hispanic male with dark hair exiting the vehicle and entering the business and then observed that man and a second Hispanic male, carrying a black bag large enough to contain a kilogram of cocaine, exiting and entering a red Toyota Tacoma.  The

64

Tacoma traveled to Defendant's residence where it entered the garage, and the garage door shut concealing the vehicle.[14] After approximately twenty minutes, the Tacoma left the residence and returned to the business, and the second Hispanic male exited the vehicle and entered the business carrying the same black bag. (Id. at SW103629-000004-SW103629-000005). The Affiant also advised that soon thereafter, Defendant's Cadillac Escalade left the residence and was stopped by law enforcement. Although an open air search of the exterior of the vehicle resulted in a positive alert by the K-9, no contraband was found in the vehicle. (Id. at SW103629-000005).

The Affiant stated that, because the [Tacoma] was concealed in the garage for twenty-two minutes before leaving, with the Escalade leaving soon thereafter, "the similarity to the transaction on June 22, 2010, the totality of the circumstances led me to believe that a drug transaction had taken place at" Defendant's residence on September 8, 2010. (Id.).

The execution of the search warrant that evening resulted in the seizure of U.S. Currency, cocaine, marijuana, scales, a firearm, cellular telephones, miscellaneous paperwork and other paraphernalia. (Gov't Ex. 1, Search Warrant Return).

---

[14]The Affiant included information that the registered owner of the Tacoma had been arrested for dangerous drugs and a drug felony. (Id. at SW103629-000005).

At the hearing, Defendant testified and called two additional witnesses, Dorothy Mitchell, his mother, and Rawle Mitchell, his step-father to support his <u>Franks</u> claim. Both Mr. and Mrs. Mitchell confirmed the information in their affidavits testifying that they had arrived at Defendant's residence on or before June 21, 2010, parking their rental vehicle on the left side of the driveway, blocking that side of the garage. (Tr. at 6-10, 23-26). Their rental vehicle did not move that evening or the morning of June 22, 2010. (Tr. at 10-11, 26-28). Both witnesses also confirmed that parked inside the two-car garage the entire time in question was Defendant's Cadillac Escalade, parked on the right, and a Rolls Royce Phantom, parked on the left side. (Tr. at 8-12, 26-28).

On cross-examination, although both witnesses initially testified that no one else was at the residence the morning of June 22 besides Defendant and that they did not hear the garage door open that morning - which they both claimed they would have heard, Mr. and Mrs. Mitchell eventually stated that at least one other person was in the residence. (Tr. at 15-22, 28, 33-43). Although neither of the witnesses saw the individual, based on Defendant's comments to them, they believed that person to be Bernard Faulk. (Tr. at 20-22, 29-30, 32). Both witnesses also, especially Mr. Mitchell, backed off their testimony that the garage door did not open that morning. In fact, Mr.

66

Mitchell confirmed hearing the garage door opening and Defendant carrying on a conversation, but he did not hear the other person. (Tr. at 20, 22, 33, 38-42).

Defendant testified that from the evening of June 21, 2010, through the morning of June 22, 2010, there were two vehicles in the garage, his Escalade and the Phantom. (Tr. at 45-47). As to the events on September 8, 2010, Defendant confirmed that although his Escalade was parked on the right side in the garage, he was unsure about whether a BMW, parked in the garage earlier, was still there at the time of the events in the affidavit for the search warrant. (Tr. at 47-49). He further testified that no other vehicle, including a Toyota Tacoma, went into or left from his garage while he was at the residence that day. (Tr. at 49-50). On cross-examination, Defendant confirmed that the only visitor to his residence the morning of June 22 was Bernard Faulk and that he did not recall a black Lexus arriving at his residence. (Tr. at 51, 53, 55-59). After he shut the garage door when Faulk left the residence, he did not hear the door open or shut again. (Tr. at 61-64). And, with respect to September 8, 2010, Defendant agreed that there could have been an empty space in the garage that morning. (Tr. at 64-65). He stated that, while he was at the residence, no one else was there and that, while he was away from the residence, no one could have entered the closed garage. (Tr. at 65-69).

The Government called several witnesses about the events of June 22, 2010, and September 8, 2010. John Clark, Special Agent, Homeland Security Investigations ("HSI"), assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF"), testified that as part of the investigation of Defendant and his co-Defendants, the agents conducted court authorized wire intercepts, which included intercepting Defendant on telephone number 334-333-0097.[15] (Tr. at 134-37). On June 22, 2010, based on intercepted telephone conversations involving Defendant, the agents believed a drug transaction would take place at Defendant's residence, and both ground and aerial surveillance was established. (Tr. at 144-45). All of the surveillance teams were in radio or telephone contact and could overhear the information related about events observed by one or more agents. (Tr. at 72-74, 76, 145-46).

Based on all of that information, at approximately 10:00 a.m., a white Honda Accord was observed at Defendant's residence, and a Hispanic male driving the Honda exited and entered Defendant's residence. (Tr. at 74-75, 79, 146-47). About fifteen minutes later, a white Chevrolet truck arrived at the residence, and two Hispanic males

---

[15]That cellular telephone was seized from Defendant on September 8, 2010. (Tr. at 182). The agents also confirmed that Defendant was using the cellular telephone with that number based on surveillance conducted pertaining to the conversations intercepted and based on the CI identifying Defendant's voice. (Tr. at 180-82).

AO 72A
(Rev.8/82)

exited and entered the garage of the residence.  (Tr. at 75, 79, 146-47).  Just a few minutes later, a black Lexus arrived and parked on the driveway, and a black male exited, subsequently identified as Chadwick Hudspeth, and entered the garage of the residence.  (Tr. at 75, 79, 147-48).  None of the men were observed carrying any objects.[16]  (Tr. at 83).  At approximately 10:25 p.m., the three men exited the garage; the two Hispanic males left in the Chevrolet pickup truck; and the black male left in the Lexus.  Nothing was observed in their hands.  (Tr. at 76, 80, 83-84, 148-48).

Shortly thereafter, the black Lexus was stopped by law enforcement and recovered from the Lexus was a kilogram of cocaine, in plastic wrapping in newspaper. Embossed on the cocaine was "D & G," and big chunk was missing from the kilogram. (Tr. at 77, 148-50, 156-57; Gov't Ex. 4C).  At approximately, 10:42 a.m., Defendant was intercepted on cellular telephone 334-333-0097 receiving a call from Isaias Mondragon.  (Tr. at 150, 152, 157; Gov't Exs. 2A, 2B).  Defendant began the conversation by complaining about the "one" he had just given to someone else because there was a "hole in it."  (Gov't Ex. 2B at 2).  The "chunk" taken out of "it" was "all the way in the corner."  (Id.).  After telling Mondragon that his guys have got

---

[16]Agent Clark testified that, based on his experience, it is easy to conceal a kilogram of cocaine on a person.  (Tr. at 150).

AO 72A
(Rev.8/82)

to stop doing that, Defendant advises that if the "guy" complains that he is "short," some more will have to be brought back. (Id.). The men then discuss the amount of "grams" and, what appears to be, the price for those grams. (Gov't Ex. 2B at 2-3).

Mondragon asks Defendant to check around in the garage for "two thousand" that is missing by "the people." (Gov't Ex. 2B at 3). Mondragon advises that he only has twenty-seven to which Defendant responds, "He, he should have counted it before he left." (Id.). Defendant agrees to check around for the money and confirms with Mondragon that "he" claims to have left it at Defendant's house. (Id.). Defendant accuses the guy of lying because "I counted it and gave it to him." (Gov't Ex. 2B at 4). Defendant said, after counting the money, he "brought him a bag and then he left." (Id.). After confirming that he looked in the garage, outside and in the weight room, Defendant said that the money was not there. (Gov't Ex. 2B at 4-5). Mondragon responds, "Alright let me call him. Maybe he just leave it in the truck. . . ." (Gov't Ex. 2B at 5).

On September 8, 2010, the agents were advised by a CI that a drug transaction would take place at Defendant's residence. (Tr. at 159). The CI had previously informed the agents about prior transactions at Defendant's residence stating that typically the CI would arrive with other participants and would drive into the garage.

Once in the garage, the garage door would close; the transaction would take place; and then the CI and others would leave in their vehicle by exiting the garage. (Tr. at 163-64). Based on the CI's information, both ground and aerial surveillance was established at the business, Alex Tires, and at Defendant's residence. (Tr. at 88-90). All of the surveillance teams were in radio and cellular telephone contact and could hear the information being reported during the surveillance. (Tr. at 91-94, 164).

Based on the surveillance, the CI was observed arriving at Alex Tires at approximately 11:30 a.m. and entering the business. (Tr. at 94, 164-65). Then, after about fifteen minutes, the CI and another Hispanic male, James Torres, who was carrying a black bag, left the business in a red truck with Torres driving. (Tr. at 94, 165-66). The red truck drove to Defendant's residence, pulling into Defendant's driveway and then entering the left side of the garage, after which the garage door closed.[17] (Tr. at 95, 166). The CI, interviewed after the transaction, advised that once inside the residence, Torres removed a kilogram of cocaine from the black bag. Defendant handed him $29,500, which Torres put into the bag. (Tr. at 168-69). After

---

[17]The MCS agent conducting aerial surveillance did not recall exactly when the left side garage door opened, but it had not been opened during most of the surveillance he conducted that morning. He first noticed the door open when the truck arrived. (Tr. at 94-95, 107-09).

71

approximately twenty minutes, the garage door opened, and the red truck was observed leaving with the same two passengers. The vehicle returned to Alex Tires. (Tr. at 96).

Agent Clark testified that the investigating agents believed that the same type of transaction as on June 22, 2010, that is, that someone would soon leave the residence with the cocaine, would happen on September 8, 2010. (Tr. at 169-70). Defendant left the residence in his Escalade approximately thirty minutes later and was stopped by law enforcement. (Tr. at 96, 110, 170). No drugs were found in his vehicle at that time or after second and third stops by law enforcement later in the day. (Tr. at 96-97, 170).

While the agents were conducting surveillance, MCS Agent Carl Wagner was tasked with remaining at the office to draft, if needed, the affidavit for a search warrant for Defendant's residence. (Tr. at 194-98, 208). When drugs were not found in Defendant's vehicles during the law enforcement stops, although not clear at exactly what time, Agent Wagner was directed by his superiors to prepare the search warrant because the agents believed the cocaine was still in the residence. (Tr. at 170-71, 208). The agents were under some time pressure because the Superior Court Judge was scheduled to leave the courthouse, some distance away, at 5:00 p.m. (Tr. at 170, 199-200, 214). Agent Clark, another agent who debriefed the CI, and other unidentified

72

agents were supplying information to Agent Wagner for the affidavit. He was not on scene on either June 22, 2010, or September 8, 2010. (Tr. at 171, 177, 198-99, 201–02, 207, 209-10). Additionally, Agent Wagner had been listening to the radio communications of the events on September 8, 2010. The atmosphere was hectic. (Tr. at 198-99). No reports for the June 22, 2010, transaction had been prepared; therefore, agents were supplying information to Agent Wagner from memory. (Tr. at 172, 199).

Agent Clark confirmed that the statement in the affidavit that the black Lexus backed into the garage on June 22, 2010, was incorrect and that he did not know who made that statement to Agent Wagner. Agent Wagner likewise did not recall who advised him that the black Lexus entered the garage on that date. (Tr. at 173-74, 201, 218). When asked how that information was included in the affidavit, Agent Wagner responded, "I don't know how it got in there, but to the best of my knowledge somebody was briefing me on what happened that day." (Tr. at 201). Agent Wagner stated that when he added the information into the affidavit and presented the affidavit to the judge, he did not know that the statement was not truthful. (Tr. at 210-11). He stated, "When I typed that in there to the best of my knowledge that was correct." (Tr. at 218).

Both agents testified that the statement was not included in the affidavit with the intent to deceive the judge reviewing the search warrant or in an attempt to "pad" the probable cause for the warrant.[18]  (Tr. at 173, 175, 202).  When asked on cross-examination how the untrue statement was added to the search warrant, Agent Clark responded:

> I believe that based off of everything that was going on that day, based on the fact that there was so many different people that were providing information historical - - I don't believe Agent Wagner was present on June 22nd if I recall correctly - - and the methodologies and the way that the information that we were provided by the informant both prior to that day as well as on that day, I believe that it was a description of how the drug deals typically occur that that's the format, that there is an actual - - like I said before, a methodology to the way these deals would happen at the residence, that someone would go into the garage, garage door would close, they go inside and whatnot.
>
> It was my understanding after the fact through a review of my report that the black Lexus had backed up into the - - or backed up to the garage or backed up in the driveway at some point.  And I don't know if that got lost in the shuffle or what.  I mean, I can't directly answer for, you know, what was put in there.

(Tr. at 183-84).  Agent Clark also disputed that what actually did happen on June 22 was that different from the information in the affidavit because the individuals

---

[18]Agent Clark stated that he did not realize until a couple of months before the evidentiary hearing that there was any misstatement in the affidavit.  He noted the discrepancy when comparing the written reports of the June 22 incident with the affidavit.  (Tr. at 176-77).

participating in the drug deal did enter the residence through the garage.  (Tr. at 184-85).  Due to the time crunch, Agent Clark did not review the affidavit before Agent Wagner left to meet the judge.[19]  (Tr. at 174, 177).

### 3. Credibility of Witnesses

Defendant is quite correct that the court must judge the credibility of the witnesses.  [Doc. 366 at 8-9].  The court not only credits the testimony of the law enforcement about what really did occur on June 22, 2010, and how that information was mistakenly and, as the court will discuss in detail below, unintentionally added to the search warrant, the court also credits the testimony of the agents and not of the Defendant as to the events on September 8, 2010.  The court finds that Defendant's testimony at the hearing was false and not due to mistake.  See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.").

---

[19]Agent Wagner also did not have an opportunity to proof the affidavit for typographical errors.  But he advised, even if he had read the affidavit over, he would not have changed any of the information in it as he believed that the information was correct.  (Tr. at 214-18).

AO 72A
(Rev.8/82)

The recorded conversation between Defendant and Mondragon on June 22, 2010, shortly after the vehicles, including the black Lexus containing the cocaine, left the residence, flatly contradicts his statements about the events that day. The conversation also corroborates the agents' testimony. Although Defendant stated that no one besides his mother, step-father, and Faulk were at his residence the morning of June 22, 2010 (Tr. at 51, 53, 56-64), the recorded conversation establishes that some "people" in a truck had been at the residence, obviously sent by Mondragon, to deliver a quantity of cocaine and then to receive payment for the drugs. (Gov't Ex. 2B at 2-5). Defendant made that payment, although Mondragon advised that the amount delivered was $2,000 short, and he asked Defendant to look for the money in his residence. (Id.). The conversation also establishes that the cocaine was delivered to someone, who, although not yet calling to complain, might very well do so because Defendant had observed that a big chunk of cocaine had been taken out of the kilogram delivered to him. (Gov't Ex. 2B at 2-3). And the fact a kilogram of cocaine, with just such a chunk missing, was seized from the black Lexus establishes that, contrary to Defendant's testimony, that vehicle - the black Lexus - was at his residence. (Tr. at 248-50, 155-56; Gov't Ex. 4C). Defendant lied, and the testimony of neither his mother nor step-father, which became pretty murky about who was or was not at the

76

residence and whether the garage door opened and closed that morning, does not support Defendant's story. (Tr. at 17-22, 28-30, 32-33, 37-43). The recorded conversation also corroborates the testimony of the agents about the events on June 22, 2010, that is, that three vehicles, including the black Lexus, were at the residence and that the occupants of the vehicles entered the residence through the garage to conduct a drug transaction. (Tr. at 75-76, 146-48).

Having found that Defendant lied about the events at this residence on June 22, 2010, the court has no reason to believe his testimony about what happened at the residence on September 8, 2010, that is, that no one else was at the residence while he was there and that no vehicle entered his garage. (Tr. at 48-49, 65-69). Contrasted with Defendant's unsubstantiated story, the consistent and otherwise undisputed testimony of the agents about the events on September 8, 2010, is credible, that is, that the Toyota Tacoma arrived at the residence and entered the garage. (Tr. at 94-95,166).

In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance

AO 72A
(Rev.8/82)

and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010). In light of the totality of the testimony presented at the hearing and weighing the factors set forth *supra*, and in order to resolve the Franks issue before the court, the court will rely on the testimony of the agents at the evidentiary hearing.

## 4. Discussion

As the court noted, Defendant bears the burden of establishing by a preponderance of the evidence both that (1) "the search warrant affidavit contains perjurious statements or statements made with a reckless disregard for the truth . . .; and (2) the search warrant no longer is supported by probable cause after setting aside the perjurious or reckless statement." Gonzalez, 2010 WL 2721882, at *12; see also Franks, 98 S. Ct. at 156; Harris, 172 Fed. Appx. at 958. Defendant has not carried his burden as to either identified statement in the affidavit.

78

With respect to the events of September 8, 2010, the court finds that the affidavit does not include any misstatement of any nature concerning the drug transaction at Defendant's residence. The court finds, based on the evidence deemed credible presented at the evidentiary hearing, that the red Toyota Tacoma arrived at Defendant's residence, drove up the driveway, entered the garage with the door closing immediately, remained inside for a short period of time, and then left from the residence. (Tr. at 95-96, 108-09, 166). Accordingly, the statement that the red Toyota Tacoma arrived at and entered the garage at the residence, followed by the garage door shutting, will not be stricken from the affidavit.

With respect to the events of June 22, 2010, although the statement that the black Lexus entered the garage is not truthful, as conceded by the Government, Defendant's evidence comes woefully short of establishing that the statement was perjurious or included with a reckless disregard for the truth. Gonzalez, 2010 WL 2721882, at *12. Agent Wagner, the affiant, included the statement about the black Lexus entering the garage in the affidavit. (Tr. at 199, 201, 209). He was not present on that date but was typing information into the affidavit being relayed by a number of agents who had been on surveillance that day, including Agent Clark. (Tr. at 171-73, 198-99, 201-02, 207). Agent Clark does not recall providing that information to

79

Agent Wagner, and Agent Wagner does not recall who made that statement. (Tr. at 173, 218). However, what is abundantly clear is that Agent Wagner believed that the information was correct when he included the information in the affidavit and presented the affidavit to the judge. (Tr. at 201-02, 210-11, 218). He did not include false information in the affidavit with the intent to deceive the judge or to "pad" probable cause. Agent Clark, who did not realize that the untruthful statement was in the affidavit until a few months ago, also did not intend to deceive the issuing judge or "pad" probable cause. (Tr. at 173, 175-77, 202).

There was also no reason, based on the totality of the circumstances, for Agent Wagner to entertain any serious doubts as to the truthfulness of the statement. <u>See</u> <u>O'Ferrell</u>, 32 F. Supp. 2d at 1301; <u>Gonzalez</u>, 2010 WL 2721882, at *13. The black Lexus was at Defendant's residence on June 22, 2010, and the occupant had exited the vehicle and entered through the garage of the residence. (Tr. at 74-76, 79-80, 146-48). Given that fact, along with the information from the CI that drug transactions at Defendant's residence typically occurred by the vehicle with the participants driving into the garage (Tr. at 159-64), as Agent Clark explained, the mistake, in the hectic environment of preparing the warrant, is understandable (Tr. at 183-85) and may

80

establishe negligence on the part of the Affiant but not a reckless disregard for the truth.

And, based on the events as they did occur on June 22, 2010, the court agrees with Agent Clark, that there is simply not a material difference between the vehicle entering the residence and the vehicle's occupant doing so. (Tr. at 184-85). If the events as they had occurred that day had been presented to the issuing judge, the affidavit would have established probable cause for the search warrant. There was no reason to intentionally present false information to the judge. See United States v. Umansky, 291 Fed. Appx. 227, 228 (11th Cir. 2008) (finding that "the hearing revealed the affiant had reasonable justifications for his inclusion or exclusion of certain facts in the search warrant affidavit"); Glinton, 154 F.3d at 1256 (discussing how the mistaken information was included in the affidavit prepared by an affiant who was not on the scene and how, in light of the events that actually occurred, the mistake was understandable, the court stated, "minor discrepancies in an affidavit should not subvert an officer's good-faith revelations of facts establishing probable cause") (citing, *inter alia*, Maryland v. Garrison, 107 S. Ct. 1013, 1018 (1987) ("Warrant still valid if inaccuracies in affidavit are 'objectively understandable and reasonable.'")).

AO 72A
(Rev.8/82)

Because the court found that the untruthful statement about the black Lexus entering Defendant's garage in the affidavit was not perjurious nor included with a reckless disregard for the truth, the statement should not be stricken from the affidavit. However, even if, that phrase is stricken from the affidavit, as well as the Affiant's conclusion that the similarities between June 22 and September 8 led to his belief a drug transaction took place on September 8, the affidavit still establishes "a fair probability that contraband or evidence of a crime will be found" in Defendant's residence. Jiminez, 224 F.3d at 1248. The black Lexus was still observed at Defendant's residence, leaving some twelve minutes after arriving, on the date that agents believed a transaction was to take place at the residence. (Gov't Ex. 1, Search Warrant, Affidavit at SW103629-000003). The Lexus was stopped shortly thereafter, and one kilogram of cocaine was seized from the vehicle. (Id.). On September 8, 2010, the CI provided detailed information about the delivery of a kilogram of cocaine to Defendant's residence, and the agents then conducted surveillance corroborating those details. (Gov't Ex. 1, Search Warrant, Affidavit at SW103629-000004). When Defendant left the residence shortly after the alleged delivery of cocaine, he was stopped and his vehicle searched. No drugs were found. (Gov't Ex. 1, Search Warrant, Affidavit at SW103629-000005). The Affiant, an experienced agent and

AO 72A
(Rev.8/82)

investigator, also opined that the totality of the circumstances (excluding the similarities between the events on June 22 and September 8)[20] led him to believe a transaction occurred at the residence on September 8, 2010. (Id.). These facts provide a sufficient nexus between the items to be seized, drugs and drug related items, and Defendant's residence. Bradley, 644 F.3d at 1263-64 ("The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation[, because, as w]e have previously found[,] . . . a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause.") (citation and internal quotation marks omitted).

Accordingly, the court finds, based on the totality of the circumstances and the evidence deemed credible by the court, that the Affiant did not include perjurious statements nor statements made with a reckless disregard for the truth in the affidavit

---

[20]The court notes that the "totality of the circumstances" includes facts other than the alleged similarities between the two incidents. The CI provided detailed and corroborated information about the drug delivery. And the circumstances of how that delivery occurred, arriving at the residence and entering the garage with the door closing to conceal those inside, then the short time at the residence, are facts that would have significance to a trained investigator.

presented to the judge. Additionally, even if the false statement regarding the events on June 22 is stricken from the affidavit, the remaining facts set forth therein establish probable cause for the warrant to search Defendant's residence.

**b.      Franks - Omissions from Affidavit**

As noted, Defendant also contends that the Affiant intentionally or with reckless disregard for the truth omitted two pieces of information from the affidavit for the search warrant, that is, in addition to the fact that his Cadillac Escalade was stopped and searched by law enforcement one time on September 8, 2010, that his vehicle was stopped a second time and that another vehicle he operated was also stopped and searched that day and that drugs were not found on those occasions. [Doc. 306 at 5]. The Government responds that Defendant has failed to establish that failure to include information about the second and third stop and search of Defendant's vehicles was intentional or reckless and that, even if that information is included in the affidavit, probable cause to search remains. [Doc. 313 at 14-17]. The court finds that Defendant did not make a substantial preliminary showing entitling him to <u>Franks</u> hearing on the alleged omissions from the affidavit.

AO 72A
(Rev.8/82)

### 1. Legal Standard

It is well settled that <u>Franks</u> is applicable to information omitted from an affidavit for a search warrant. "[A] warrant affidavit violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (citation omitted). "A party need not show by direct evidence that the affiant makes an omission recklessly. Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from the proof of the omission itself.'" <u>Id.</u> at 1327 (citation omitted); <u>accord</u> <u>United States v. Owden</u>, 345 Fed. Appx. 448, 454 (11th Cir. 2009) (same). "Omissions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . . Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." <u>Madiwale</u>, 117 F.3d at 1327; <u>accord</u> <u>Kapordelis</u>, 569 F.3d at 1309 ("The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'") (citation omitted). No <u>Franks</u> hearing is required, if, when the omitted

information is added to the affidavit, the affidavit's content still establishes probable cause for the search. <u>Kapordelis</u>, 569 F.3d at 1309; <u>Owden</u>, 345 Fed. Appx. at 454.

### 2. Discussion

Defendant simply has not established that, even if the omitted information was included in the affidavit, the contents would not establish probable cause to search his residence.[21] The affidavit set forth the events on September 8, 2010, involving the information provided by the confidential informant about a drug delivery scheduled to take place at Defendant's residence. The agents conducted surveillance corroborating the information about how and when that delivery would occur. (Gov't Ex. 1, Search Warrant Affidavit, SW103629-000004-SW103629-000005). After the vehicle supposedly making the delivery to Defendant's residence left, the Affiant also advised that soon thereafter, Defendant's Cadillac Escalade left the residence and was stopped by law enforcement. Although an open air search of the exterior of the vehicle resulted in a positive alert by the K-9, no contraband was found in the vehicle. (<u>Id.</u> at SW103629-000005). The implication of that observation being that the kilogram of

---

[21]By going directly to this discussion, the court does not find Defendant has established either an intentional or reckless omission from the affidavit by the Affiant.

86

cocaine remained in Defendant's residence.[22]  If the Affiant had added to the search warrant affidavit that Defendant's Escalade was stopped a second time, after leaving the residence again, and that another vehicle he was driving was stopped, after leaving his residence, without drugs being found on those two occasions, instead of undermining the probable cause finding, the information would have further supported the Affiant's belief that the cocaine remained in Defendant's residence.

Defendant has not met his burden to demonstrate that the alleged omissions from the affidavit were intentional or reckless or that, regardless of that showing, if included in the affidavit, the contents no longer establish probable cause.  He is not entitled to a <u>Franks</u> hearing.

### c.    Confidential Informant

Defendant's final attack on the affidavit focuses on the alleged lack of information in the affidavit establishing the veracity and reliability of the CI who provided the information about the delivery of drugs to his residence on September 8, 2010.  [Doc. 272 at 7; Doc. 366 at 10-11].  Defendant is correct that the affidavit for

---

[22]When drugs were not found in Defendant's vehicles during the law enforcement stops, Agent Wagner was directed by his superiors to prepare the search warrant because the agents believed the cocaine was still in the residence.  (Tr. at 170-71, 208).

the search warrant does not provide information indicating that the CI had provided information in the past to law enforcement that was reliable or any other information about the CI for the judge to evaluate reliability on that basis. (Gov't Ex. 1, Search Warrant Affidavit). However, the Government contends that because the detailed and specific information that the CI provided about the delivery on September 8, 2010, was corroborated by independent law enforcement surveillance set forth in the affidavit, the judge had sufficient information to evaluate the CI's reliability and veracity. [Doc. 313 at 9-10; Doc. 373 at 24-26]. The court finds that the Affiant provided the judge with sufficient information to establish that the CI's information was reliable.

The court previously set forth the legal standard applicable to Defendant's argument. "If an informant is mentioned in the affidavit, the affidavit must demonstrate the informant's 'veracity' and 'basis of knowledge.'" Johnson, 444 Fed. Appx. at 425 (quoting Gates, 103 S. Ct. at 2332). "However, '[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.'" Id. (quoting Martin, 297 F.3d at 1314). In this case, the court finds that the independent corroboration of the CI's detailed information about the drug delivery satisfies the Affiant's burden.

The Affiant outlined in the affidavit information received on September 8, 2010, from the CI who advised that a kilogram of cocaine was to be delivered to Defendant's residence. The CI advised that several Hispanic males, coming from an identified local business would deliver the cocaine. The CI specified that a maroon Chevrolet Astro van, driven by a short Hispanic male with dark hair, would arrive at the specified business to pick up the cocaine and would then proceed in another vehicle with one or more Hispanic males to Defendant's residence. At the residence, the CI advised that the vehicle would enter the garage, that the garage door would close and that the transaction would be conducted. Afterwards, the vehicle with the Hispanic males would leave returning to the business. (Gov't Ex. 1, Search Warrant Affidavit at SW103629-000004).

The surveillance conducted thereafter was set forth in the affidavit advising that the agents observed the maroon Chevrolet Astro arrive at the business, observed the short Hispanic male with dark hair exiting the vehicle and entering the business and then observing that man and a second Hispanic male, carrying a black bag large enough to contain a kilogram of cocaine, exiting and entering a red Toyota Tacoma. The Tacoma traveled to Defendant's residence where it entered the garage, and the

89

garage door shut concealing the vehicle.[23]   After approximately twenty minutes, the Tacoma left the residence, returned to the business, and the second Hispanic male exited the vehicle and entered the business carrying the same black bag.  (Id. at SW103629-000004-SW103629-000005).

Given the specificity of the CI's information and that surveillance corroborated every detail, the judge properly relied on the CI's information concerning the illegal purpose of the trip to Defendant's residence.  The judge would have reasonably concluded that the CI was a participant in the events on September 8, 2010, such that he or she was providing first hand knowledge of those events.[24]   Accordingly, the instant affidavit not only set forth an "explicit and detailed description of the alleged wrongdoing," see Gates, 103 S. Ct. at 2330, for the judge to evaluate, it is clear from the affidavit that the informant was recounting events that he observed firsthand; therefore, the tip is entitled "to greater weight than might otherwise be the case[,]" see id.  See also Bramlett, 232 Fed. Appx. at 943; Brundidge, 170 F.3d at 1353; Foree, 43 F.3d at 1576.

---

[23]The Affiant included information that the registered owner of the Tacoma had been arrested for dangerous drugs and a drug felony.  (Id. at SW103629-000005).

[24]In fact, the CI was a participant, that is, he was the Hispanic male driving the maroon Chevrolet van.  (Tr. at 164-66).

AO 72A
(Rev.8/82)

Accordingly, the court finds that the affidavit provided sufficient information for the judge to evaluate and rely on the information provided by the CI in determining whether the affidavit established probable cause to search Defendant's residence.

### d.　Good Faith

The Government asserts that even if the affidavit for the search warrant did not establish probable cause for the search of Defendant's residence, the court should apply the good faith exception to the exclusionary rule in this case. [Doc. 373 at 26-33]. The court agrees. The court set forth the law governing application of the good faith exception *supra*. See Accardo, 749 F.2d at 1480-81. Based on the discussion of Defendant's attacks on the affidavit, arguably the exception would not apply in this case "'if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422). However, as the court has determined, the Affiant did not include perjurious statements in the affidavit, and he was not reckless in preparing the affidavit. The admittedly false statement in the affidavit, if omitted, did not undermine a finding of probable cause. The Affiant and the executing law enforcement agents, based on the totality of the information in the affidavit, reasonably relied on the judge's determination that probable cause supports the warrant

91

to search Defendant's residence. See Glinton, 154 F.3d at 1257 (the affidavit was not a "'bare-bone' statement of nothing more than conclusory allegations").

### e. Conclusion

For the foregoing reasons and cited authority, the court finds that Defendant did not carry his burden under Franks to establish by a preponderance of the evidence that the affidavit included perjurious statements or statements made in reckless disregard for the truth, that Defendant did not make a substantial preliminary showing under Franks that omissions from the affidavit were intentional or were in reckless disregard for the truth or, if included in the affidavit, would have undermined a finding of probable cause, and that the affidavit provided sufficient information to establish the reliability of the CI. In the alternative, the court finds that the good faith exception to the exclusionary rule applies in this case. Accordingly, the court **RECOMMENDS** that Defendant's motion [Doc. 272] to suppress the September 8, 2010, search of his residence be **DENIED**.

## II. January 20, 2011, Warrantless Search of Residence and Vehicle

Defendant contends that the search of his residence on January 20, 2011, was not conducted pursuant to a voluntary consent to search - Defendant, in fact, contends that he was not asked to consent to any search of his residence or his vehicle and that

92

he refused to sign a consent to search form. [Doc. 330 at 2-5]. The Government opposes the motion to suppress contending that Defendant did consent to the search of his residence and that the search of the vehicle was a lawful inventory search conducted after the vehicle was seized for forfeiture. [Doc. 335]. An evidentiary hearing was held on the motion to suppress on October 6, 2011.[25] [Doc. 325].

### a. Background Facts

On January 20, 2011, Special Agents with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), accompanied by uniform Cobb County police officers, were at Defendant Harrison's residence, 1724 Brandon Lee Way, Marietta, Georgia, to execute a federal arrest warrant issued following the return of the indictment in this case. (Tr. at 4-5, 14, 35, 64; Gov't Exs. 1, 4; Def. Ex. 1). The agents arrived at the residence approximately 6:00 a.m., on a pretty cold morning. (Tr. at 5, 16-17, 36, 65). ICE Group Supervisor Christopher Healy and Special Agents Andre Kenneybrew and Charles Ingram proceeded to the top of the steps onto the porch at the front door, and Agent Healy knocked on the door. These agents did not have their weapons drawn. (Tr. at 3, 6-7, 65). A couple of other ICE agents, including the team leader for the location, Special Agent Wendy Stewart, were

_____

[25]Citations to the hearing are: (Tr. at ).

standing at the bottom of the stairs. (Tr. at 7, 47, 65, 75). The uniform Cobb County officers were securing the perimeter of the residence, standing off to each side of the residence. (Tr. at 6, 36, 66). A total of nine to twelve law enforcement officers were present. (Tr. at 64, 75).

The ICE agents were in casual clothing with vests marked with ICE, or DHS, or police. They were not in riot gear, wearing helmets or masks, or holding shields. (Tr. at 6, 64). One or more of the agents at the bottom of the stairs had their weapons drawn while waiting for someone to answer the door. (Tr. at 69-70, 76). When no one answered the door, Agent Healy knocked on the door again loud enough to awaken someone sleeping inside and announced, "police." (Tr. at 7-8, 32, 36-37, 49). Defendant, wearing a t-shirt and boxer shorts, answered the door and asked what was going on. (Tr. at 8, 16, 27, 32). Once the agents observed that Defendant did not have a weapon in his hands or obviously in his clothing and that Defendant was calm, the agents holstered their weapons. (Tr. at 41, 43-44, 70).

Agent Healy asked Defendant if he was Gregory Harrison, and when Defendant confirmed that he was, the agent advised Defendant that they had a warrant for his arrest and asked him if the agents could search his house for guns and drugs. (Tr. at 8, 18, 32, 49). The Defendant agreed, saying something to the effect, "That's fine."

94

(Tr. at 8, 18, 32-33, 49). The consent was obtained within thirty to forty-five seconds of Defendant answering the door. (Tr. at 9, 69). The agents did not raise their voices, threaten Defendant in any manner, handcuff Defendant, or make him any promises. No firearms were drawn. Defendant appeared to be awake. (Tr. at 9-10, 17, 30, 42-43, 48). Defendant was not told that he could refuse to consent to the search. (Tr. at 19). After Defendant consented, Agent Healy with other agents entered the residence, and Defendant was taken outside and at some point handcuffed.[26] (Tr. at 10, 27, 37, 50, 68).

The residence was a split-level, with a small landing just inside the front door. From the landing, one set of stairs leads to the lower level which had a living area-theater room, bedrooms, bathroom and entry to the garage. (Tr. at 11, 52). The set of

---

[26]Agent Stewart, as noted, was standing at the bottom of the steps several feet away and not interacting with Defendant. (Tr. at 65). On cross-examination, Defendant's attorney asked Agent Stewart a series of questions about the events - in the sequence chosen by the attorney, to which for the most part the agent gave one word answers. (Tr. at 66-67). That sequence of events, such as when Defendant stepped out the residence, was handcuffed, and gave consent to search does not coincide with the testimony of the two agents standing at the door and speaking directly with Defendant. And Agent Stewart, on cross-examination and re-direct, confirmed that she could not hear all of the conversation with Defendant and that she was not sure about the sequence of events at the doorway. (Tr. at 67-68, 75). Due to Agent Stewart's inability to hear and observe clearly what was transpiring at the top of the steps at the doorway, the court will rely on the testimony of Agents Healy and Kenneybrew.

AO 72A
(Rev.8/82)

stairs going up leads to the living room, kitchen and remaining bedrooms. (Tr. at 11). As the agents entered the residence, they gathered members of Defendant's family, his mother, his step-father, and his twelve year old daughter and her mother into the living room and asked that they be seated. (Tr. at 11, 39, 49). Agent Healy explained that the agents were present to arrest Defendant on a federal warrant, that Defendant had consented to a search of the residence, and that the agents would be searching. (Tr. at 11-12, 49). The agents did not physically touch or threaten Defendant's family, and they did not raise their voices. As far as the agents who testified at the hearing were aware, no firearms were drawn after entry into the residence or pointed at any family members. (Tr. at 12, 28-29, 43-44, 50).

After a short period of time, Defendant, who was now handcuffed behind his back, was brought inside, allowed to dress, and then taken downstairs to the living area-theater room. (Tr. at 23, 26-28, 38). While other agents conducted the search of the residence, Agent Kenneybrew maintained custody of Defendant. (Tr. at 26, 33-35). Defendant was asked if he would like to answer questions, and when he declined, Defendant was not questioned. (Tr. at 28). Agent Kenneybrew did not recall Defendant being presented with or being asked to sign a written consent to search form, and as far as Agent Healy, who was the supervisor for all of the ICE agents

96

present, was aware, Defendant was not asked to put his verbal consent to search in writing.[27]  (Tr. at 3, 20-21, 29-31, 34-35).  Defendant did not object to the search or withdraw his consent as the search was being conducted.  (Tr. at 30-32, 50, 73).

In the garage, the agents found a filing cabinet, which was large enough to contain either drugs or firearms.  (Tr. at 52-53; Gov't Ex. 2A).  Inside a drawer of the filing cabinet, the agents located a folder, also large enough to contain drugs or firearms, containing Western Union receipts for monetary transactions.  (Tr. at 52-53; Gov't Ex. 2B).  Based on Agent Stewart's training and experience involving investigations of drug traffickers, she knew that such receipts could be evidence of

_____

[27]Agent Stewart testified that she "recall[ed] being told that [Defendant] had declined to sign something."  (Tr. at 50).  She assumed that the form was a written consent to search form; however, she was not involved in the conversation with Defendant about the form, was standing on the other side of the room and only heard part of the conversation about the form, and did not see any form.  (Tr. at 51, 71-72).  She heard Defendant say that he would not sign anything; she heard the agents ask if they could still look; and she heard Defendant respond, yes.  (Tr. at 71).  The court does not credit any of this testimony because it is rife with speculation on Agent Stewart's part and not based on her personal involvement in the conversation with Defendant, as evidenced by her use of words such as "I believe," "from my understanding," "recall being told," and "[t]hat is what I thought. . . ."  (Tr. at 51, 71-72).  However, Agent Kenneybrew was present with Defendant, and his primary task was supervising Defendant, indicating that his testimony regarding the exchanges with Defendant are more reliable.

illegal drug transactions. The evidentiary value of the receipts was apparent at the time the folder was opened. (Tr. at 46-47, 53, 62). The receipts were seized.

Also in the garage, the agents located Defendant's Cadillac Escalade that was on a list of vehicles to be seized, as subject to forfeiture. (Tr. at 54, 74, 61). The Escalade had been used by Defendant as transportation in connection with drug activities. (Tr. at 55). The Escalade was impounded and relocated to the Cobb County fair grounds, along with other vehicles seized that day, to be inventoried. (Tr. at 55-57). Pursuant to ICE inventory procedures, the vehicle was searched and additional Western Union receipts were seized, for the same reason as noted with the receipts in the residence, and a cellular telephone was seized because cellular telephones are used in illegal drug transactions and due to the wiretaps in this case. (Tr. at 54-55, 57-60; Gov't Exs. 3, 5).

Defendant presented evidence at the hearing, the testimony of his mother, Dorothy Mitchell, his step-father of seventeen years, Rawle Mitchell, and the mother of his twelve year old daughter, Tousheema Berry. Defendant also testified. (Tr. at 77, 85, 92-93, 101). The testimony of Defendant's family frankly, even if accepted as credible, adds nothing to the facts pertinent to the issue whether Defendant voluntarily consented to the search of his residence. None of the witnesses observed or heard

98

Defendant answer the door, Defendant's conversation with Agent Healy, or any of the events at the door or on the front porch prior to Defendant being handcuffed and relocated inside the residence. (Tr. at 79, 83, 86-87, 89, 95-98). None of these witnesses were present on the lower level with Defendant or overheard any of the conversations at that time. (Tr. at 81-82, 87-88, 98-99). Although all of the witnesses estimated that less than one minute elapsed from the time of the knocking on the door until they observed Defendant in handcuffs and agents inside the residence (Tr. at 79, 87, 97), that time-frame roughly coincides with the agents' estimate of the timing of events (Tr. at 9, 69). Testimony about the events after Defendant consented is not pertinent to the voluntariness of the consent but even that testimony does not differ significantly from the testimony of the agents. Only Mr. Mitchell observed any agent with a weapon drawn and that occurred while Mr. Mitchell remained downstairs and initially unknown to the agent and while he was escorted to the upper level during the time the residence was being secured. (Tr. at 84, 86-87, 89-91, 98). None of Defendant's family was touched, except for a guiding hand being placed on Mr. Mitchell's shoulder as he was directed to a seat in the living room. (Tr. at 84, 91, 100). And, if agents directed family members to exit from their bedrooms with their hands

99

up as the family testified (Tr. at 79, 86, 98), that was a reasonable precaution and not significant to resolution of the motion to suppress.

However, as he and the Government note, Defendant's testimony at the evidentiary hearing did conflict with that of the agents, especially regarding whether Defendant initially gave verbal consent to search and whether Defendant subsequently refused to sign a consent to search form. [Doc. 330 at 6-7; Doc. 335 at 17-18]. The court, having observed the testimony of all of the witnesses finds that the agents' testimony as set forth *supra* credible. See Ramirez-Chilel, 289 F.3d at 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."). As discussed *supra*, in weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750.

The court, in addition to observing each witness testify, has reviewed the evidentiary hearing transcript, while carefully considering the issues raised by Defendant and the Government regarding credibility and finds that Defendant was not credible for the following reasons. Defendant testified that after he answered the door

100

in response to the agents' knocking, he was asked if he was Gregory Harrison. Defendant responded, yes.  At that point, he stated that he was asked to step outside, informed that he was under arrest and handcuffed behind his back.  (Tr. at 102).  The agents then asked if anyone else was inside, and Defendant responded that his family was in the residence and that he asked for some clothes.  (Tr. at 103).  According to Defendant, agents entered the residence still asking questions about where everyone was in the residence.  (Tr. at 103).  Defendant stated that he remained outside on the porch while his family were all taken to the living room.[28]  (Tr. at 104).  Defendant was then taken downstairs, still without any clothing.  (Tr. at 104-05).  Defendant stated that a Cobb County police officer, who had a form, and a U.S. Marshal then asked, "let me get you to sign a consent form to search."  (Tr. at 105-06).  Defendant responded, "I'm not going to sign any consent form to search anything."  (Tr. at 105-06).  And then, when the officer said, you invited us in, Defendant denied that he had invited anyone inside the residence.  (Tr. at 105-06).  Defendant denied ever being asked for any consent to search either his residence or his Escalade.  (Tr. at 102-03, 107).

_____

[28]This testimony, while arguably agreeing with the agents' recollection of events, flatly contradicts the version of events told by Defendant's mother, step-father, and Ms. Berry.  (Tr. at 10-11, 23, 79, 87, 97).

101

Agents Healy and Kenneybrew both specifically testified to asking Defendant for consent to search the residence for guns and drugs. (Tr. at 8, 18, 32-33). They also testified consistently about the events at the doorway involving Defendant's consent to search the residence. (Tr. at 7-9, 16-18, 32-33, 36-37, 42-43). Neither agent had any reason to lie about asking Defendant for consent, and Defendant conceded on cross-examination that he had nothing to hide in the residence, such as drugs or firearms, which would have caused him to decline consent for fear of those items being located. (Tr. at 111-12).

And Defendant's credibility is further undermined by his testimony that a Cobb County police officer and U.S. Marshal[29] were the law enforcement officers involved in asking for him to sign the consent to search form. That testimony simply does not make sense to the court. Defendant was arrested on a federal indictment as the result of an ICE investigation. (Tr. at 3-4; Gov't Ex. 4). The team leader and Group Supervisor on scene were ICE agents. (Tr. at 3, 47). Neither Cobb County police officers nor the U.S. Marshals, even if inside the residence - which no other testimony supports, would have any reason to involve themselves with investigatory actions, such

---

[29]None of the Government's witnesses stated that anyone with the United States Marshal Service was at Defendant's residence. (Tr. at 14-15, 35, 64).

as searching the residence. These officers were not at the door to arrest Defendant. (Tr. at 6-7). As true in similar federal arrest situations, uniform law enforcement personnel were on scene for security - the Cobb County police officers on January 20, 2011, were providing perimeter security at the residence. (Tr. at 6, 64-66). The court concludes that Defendant, being aware of Agent Stewart's speculative testimony about an agent presenting Defendant with a form she thought was a consent to search, wholly made up these events. And this conclusion is further supported by Defendant's concession that, although he observed agents searching the lower level of the residence, he never said "stop searching, I object," even though he supposedly refused to sign any form and disputed consenting to any search. (Tr. at 108-09). His testimony is internally contradictory.[30]

Unless the evidence as found by the court "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" none of which the court believes is true of the testimony in this case, a reviewing court should

---

[30]Also significant to the court's determination that Defendant's testimony at this hearing is not credible is the court's conclusion that Defendant lied under oath at the Franks hearing, discussed *supra*. If Defendant is willing to lie under oath at one hearing, the court doubts that he would hesitate to do so whenever given the opportunity.

accept those findings of fact. <u>Ramirez-Chilel</u>, 289 F.3d at 749 (citations omitted). Agents Healy's and Kenneybrew's testimony is consistent, believable and credible. While for the reasons stated, the court finds that Defendant's testimony is not credible.

Additional facts will be set forth as necessary in discussion of Defendant's motion to suppress.

### b. Discussion

To the extent that Defendant's motion is based on his testimony that he was not asked for consent to search his home and, thus, never consented, that argument is meritless given the court's finding that the agents' testimony that Defendant was asked if the agents could search his residence for guns and drugs and that Defendant consented is credible. (Tr. at 8, 18, 32-33). To the extent that Defendant makes the alternative argument that the Government did not establish that his consent was voluntary, based on the totality of the circumstances, the court finds that the Government has established that Defendant voluntarily consented to a search of his residence.

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a home] without a warrant so long as they first obtain the voluntary consent [for the search]." <u>United States v.</u>

<u>Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989) (citing <u>Schneckloth v. Bustamonte</u>, 93 S. Ct. 2041 (1973)). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." <u>Id.</u> at 798 (citing <u>Schneckloth</u>, 93 S. Ct. at 2059); <u>see also</u> <u>United States v. Nuyens</u>, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." <u>Blake</u>, 888 F.2d at 798 (citing <u>United States v. Massell</u>, 823 F.2d 1503, 1507 (11th Cir. 1987)); <u>see also</u> <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in <u>United States v. Acosta</u>, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" <u>Id.</u> at 1151 (quoting <u>Blake</u>, 888 F.2d at 798). In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the

105

presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court

106

explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent.[31] Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The facts found credible by this court establish that Defendant's consent to search was voluntary. At approximately 6:00 a.m., on January 20, 2011, ICE agents, accompanied by local police officers securing the perimeter of the residence, were at Defendant Harrison's residence, 1724 Brandon Lee Way, Marietta, Georgia, to execute a federal arrest warrant. (Tr. at 4-5, 14, 16-17, 35-36, 64-66; Gov't Ex. 1; Def. Ex. 1). ICE Agents Healy, Kenneybrew and Ingram proceeded to the top of the steps onto the porch at the front door, and Agent Healy knocked on the door. He knocked a second time and announced their presence as police. These agents did not have their weapons

---

[31] As the Government points out [Doc. 335 at 11-12], to the extent that Defendant contends that the evidence does not establish that he knowingly consented to the search [Doc. 5-8], such proof is not necessary to establish a valid consent.

107

drawn. (Tr. at 6-7, 9, 43, 65). A couple of other ICE agents, including the team leader for the location, Agent Stewart, were standing at the bottom of the stairs with their weapons drawn. (Tr. at 7, 47, 65, 75).

Defendant, wearing a t-shirt and boxer shorts, answered the door and asked what was going on. (Tr. at 8, 16, 27, 32). Once the agents observed that Defendant did not have a weapon in his hands or obviously in his clothing and that Defendant was calm, the agents holstered their weapons. (Tr. at 41, 43-44, 70). Agent Healy asked Defendant if he was Gregory Harrison, and when Defendant confirmed that he was, the agent advised Defendant that they had a warrant for his arrest and asked him if the agents could search his house for guns and drugs. (Tr. at 8, 18, 32, 49). The Defendant agreed, saying something to the effect, "That's fine." (Tr. at 8, 18, 32-33, 49). The consent was obtained within thirty to forty-five seconds of Defendant answering the door. (Tr. at 9, 69). The agents did not raise their voices, threaten Defendant in any manner, handcuff Defendant, or make him promises. No firearms were drawn. Defendant appeared to be awake. (Tr. at 9-10, 17, 30, 42-43, 48). After Defendant consented, Agent Healy with other agents entered the residence, and Defendant was taken outside and at some point handcuffed. (Tr. at 10, 27, 37, 50, 68).

AO 72A
(Rev.8/82)

The fact that Defendant was placed under arrest "does not necessarily vitiate [Defendant Harrison's] valid consent to search." United States v. Smith, 199 Fed. Appx. 759, 763 (11th Cir. 2006). In fact, arrest situations involving substantially greater demonstrations of force and physical restraint of a suspect have not been found to establish that a consent was coerced. See, e.g., United States v. Kimoana, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had calmed down and no show of force was being exhibited); United States v. Taylor, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured. Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary."); United States v. Hidalgo, 7 F.3d

109

1566, 1570-71 (11th Cir. 1993) (facts that the defendant was arrested by "SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of <u>Miranda</u> rights); <u>United States v. Garcia</u>, 890 F.2d 355, 360-62 (11th Cir. 1989) (the court found voluntary a consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his <u>Miranda</u> rights, and the officers had refused to accept a limited consent).

Contrasted with the facts in other cases which courts have found did not invalidate the voluntariness of a consent to search, nothing in the events surrounding Defendant Harrison's consent to search was sufficiently coercive to result in a finding that his consent was involuntary. In <u>United States v. Strickland</u>, 245 F.3d 368 (4th Cir. 2001), the Fourth Circuit Court of Appeals refused to find that a consent to search was involuntary. In <u>Strickland</u>, officers arrived at the defendant's residence at 6:30 a.m. and unsuccessfully attempted to wake him by pounding on the door and the side of the trailer. They, therefore, broke open the front door, entered, and handcuffed both the defendant's wife and the defendant, who at the time was dressed only in his

110

underwear.[32]  Both were seated, handcuffed, in the living room - the defendant still in

his underwear.  The agents asked if there were any weapons in the residence or any

more marijuana, the agents having seen the latter on a kitchen counter.  The defendant

pointed out the location of a firearm and responded negatively to the question about

additional marijuana.  The agents then asked for consent to search the residence, and

both the defendant and his wife consented.  Id. at 382-83.  The court upheld the

consent finding that the officers did not use any force other than that necessary to

effect the entry into the residence and to arrest the defendant and that no facts indicated

that the defendant was coerced into consenting to the search.  Id.  See also United

States v. Guiterrez, 92 F.3d 468, 470-71 (7th Cir. 1996) (the circumstances surrounding

the consent, including approximately a dozen federal agents entering the premises with

weapons drawn, handcuffing the individuals present and ordering them up against the

wall, including the defendant, and the fear of being arrested, was not so inherently

coercive to render the consent involuntary); Espinosa-Orlando, 704 F.2d at 512-13 (the

court found that the consent to search was voluntary although the defendant had been

detained and placed on the ground by armed officers and although one of the officers

---

[32]The defendant's wife was advised that she was not under arrest but only
handcuffed for officer safety.  Id. at 382-83.

still had his weapon drawn pointed away from the defendant at the ground, because there was no abusive language used and no threats, because the request was made in a conversational tone, and because the defendant was not handcuffed or removed from the scene of the stop and detention).

Although Defendant was not told that he could refuse to consent to the search (Tr. at 19), as noted, being advised of that fact is not "the *sine qua non* of effective consent.'"[33] Zapata, 180 F.3d at 1241. Moreover, "the agents' failure to have [or to ask Defendant to] sign a consent to search form[, as the evidence the court finds credible establishes,] does not support the contention that [Defendant] did not voluntarily consent to the search because [the court finds that Defendant] orally consented. . . . The lack of a consent to search form does not automatically render consent involuntary." Weeks, 666 F. Supp. 2d at 1376 n.33 (citations omitted).

Finally, Defendant acknowledged that he had nothing to hide in the residence, such as drugs or firearms, which would have caused him to decline consent for fear of those items being located. (Tr. at 111-12). Defendant also conceded that he did not

---

[33]And, if the court had credited Defendant's testimony that he was presented with a written consent to search form which he declined to sign, his refusal would have demonstrated that "he was not merely acquiescing to the actions of the officers[,]" Alim, 256 Fed. Appx. at 239, and that he was aware of his "right to refuse" to consent, United States v. Weeks, 666 F. Supp. 2d 1354, 1376 (N.D. Ga. 2009).

112

object to the search or withdraw his consent as the search was being conducted. (Tr. at 30-32, 50, 73). For that matter, Defendant apparently did not express any concerns about the search being conducted or ask what the agents were doing.

The totality of the circumstances demonstrate that Defendant voluntarily consented to a search of his residence. The seizure of the evidence as a result of that search did not violate Defendant's Fourth Amendment rights.[34]

The only argument that Defendant makes regarding the search of the Cadillac Escalade is that, if the agents illegally entered and searched his residence, then the

---

[34]Defendant's post-hearing brief does not challenge the scope of the Government's search or the seizure of the Western Union monetary transaction receipts, which are neither guns nor drugs. [Doc. 330]. The Government's evidence establishes that seizure of those items fell within the plain view doctrine. See Horton v. California, 110 S. Ct. 2301, 2306 (1990). "An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995). The agents were lawfully searching Defendant's residence pursuant to his consent, and the filing cabinet drawer and folder were large enough to contain the objects of the search, guns and drugs. (Tr. at 51-53; Gov't Exs. 2A, 2B). Agent Stewart also testified, based on her training and experience, that the evidentiary value of the receipts were immediately apparent. (Tr. at 46-47, 53). See United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1996) ("The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband" which "does not require certainty" and which requires a court to "consider the totality of the circumstances-including the officers' training and experience as well as their knowledge of the situation at hand.").

113

evidence obtained, more Western Union receipts and a cellular telephone, during the search of the vehicle constitutes fruit of the poisonous tree. [Doc. 330 at 8 n.2]. The seizure and search of the vehicle is not tainted by any illegal entry or search of the residence. Additionally, as the Government argues, a valid inventory search of the vehicle occurred following its seizure for forfeiture. [Doc. 335 at 18-20]. After lawfully taking custody of a vehicle, law enforcement officers may conduct an inventory search of the vehicle in order to protect the owner's property while it is in police custody, to protect the police from claims of lost or stolen property, and to protect the police from potential danger. See Colorado v. Bertine, 107 S. Ct. 738, 741 (1987); United States v. Crawford, 294 Fed. Appx. 466, 472 (11th Cir. 2008). An inventory search must be conducted according to standardized criteria and "must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 110 S. Ct. 1632, 1635 (1990); see also Crawford, 294 Fed. Appx. at 472 (same); United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991) ("The Supreme Court has indicated that inventory searches are only justifiable if performed pursuant to explicit and comprehensive procedures. Without such procedures, officers are left with no guidance in the performance of a duty which is meant not as an investigatory technique but as a means for safeguarding individuals' possessions and

114

protecting police from false claims."). The inventory search in this case complied with these guidelines.

In the garage, the agents located Defendant's Cadillac Escalade that was on a list of vehicles to be seized, as subject to forfeiture because the Escalade had been used by Defendant as transportation in connection with drug activities. (Tr. at 54-55, 74, 61). The Escalade was impounded and relocated to the Cobb County fair grounds, along with other vehicles seized that day, to be inventoried. (Tr. at 55-57). Pursuant to ICE inventory procedures, the vehicle was searched and additional Western Union receipts were seized, for the same reason as noted with the receipts in the residence, and a cellular telephone was seized because cellular telephones are used in illegal drug transactions and due to the wiretaps in this case. (Tr. at 54-55, 57-60; Gov't Exs. 3, 5).

### c.     Conclusion

For the foregoing reasons and cited authority, the court recommends that Defendant's motion [Doc. 272] to suppress evidence seized from the warrantless searches of his residence and vehicle be denied.

115

## Motions for Disclosure of Confidential Informants

Pending before the court are three motions for disclosure of the identities of confidential informants, of contact information for these individuals, and of impeaching information related to these individuals. Defendant Villanueva Pineda contends that at least one informant participated in transactions involving Defendant in September and November of 2010 and that the information provided by the informant was "used as the basis for obtaining search warrants of the defendant's businesses[.]" [Doc. 265 at 1]. Defendant Villanueva Pineda seeks the identity of such informants, as well as contact information and all potentially impeaching information. [Id. at 2]. Defendant Baza seeks the identity of a confidential informant "from South Carolina" who "attempted to set up a transaction to purchase cocaine with a *co-defendant*" and who had "recorded conversations with other *co-defendants*" but who had "no negotiations or other contact with Defendant Baza[.]" [Doc. 199 at 2]. Although Defendant Baza contends that this CI "directly participated in the criminal activity," Defendant seeks disclosure, as best the court can determine, to establish that the CI did not have contact with Defendant. [Id. at 2-3]. Defendant Baza seeks the identity and contact information for this informant. [Id. at 3]. And Defendant Harrison seeks the identity of at least one informant who participated in transactions in June,

116

July, and September of 2010 involving Defendant and who was used to obtain search warrants.  Defendant seeks the identity of the confidential informant(s) so he "can attempt to interview them in preparation for the hearings on Harrison's motions and for trial."  [Doc. 269 at 1-3, 4].  In addition to the confidential informant(s) identity, Defendant Harrison seeks contact information and all impeaching information.  [Id. at 4-5].

The Government has responded to the motions for disclosure of the confidential informants stating, "In the present case, there were separate informants who played some role in the criminal activity at issue.  Different informants were used to gather information against different defendants. . . .  [T]he government will herein treat the three informants as though they were a single unit, with any disclosure being made to all defendants."  [Doc. 299 at 5].  The Government further stated, "As the case now stands, the government intends to call each of the three confidential informants as witnesses during trial[,]" and, although the Government is not seeking to protect the confidential informants' identities, the Government opposes early disclosure of identities or any related information.  [Id. at 6].  As regards the timing of disclosure of identities and impeaching information, the Government indicated that Jencks and Giglio information is provided "by policy . . . generally about one week before trial."

117

[Id.]. at 4]. The Government opposes providing contact information for any witness, including confidential informants. [Id. at 6]. Alternatively, the Government contends that Defendants have not established a basis for disclosure of any confidential informants. [Id. at 7-8].

"Although the government has the privilege to withhold from disclosure the identity of its informants, this privilege is limited." United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991) (citing Roviaro v. United States, 77 S. Ct. 623, 627-28 (1957)). "'Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.'" United States v. Flores, 572 F.3d 1254, 1265 (11th Cir. 2009) (quoting Roviaro, 77 S. Ct. at 628). However, the court finds that Roviaro is not applicable to the issue of early disclosure of the identity of the confidential informants in this case who participated in the underlying criminal activity and who will be testifying at trial. In Banks v. Dretke, 124 S. Ct. 1256 (2004), the Supreme Court stated, "The issue of evidentiary law in Roviaro was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness." Id. at 1276 (emphasis in original); accord United States v. Casseus, 282 F.3d 253, 257 (3rd Cir. 2002) (finding

reliance on <u>Roviaro</u> inappropriate because that case "address[es] the duty of the prosecution to disclose the identity of confidential informants who will not testify"); <u>United States v. Koschtschuk</u>, 2010 WL 584018, at *8 (W.D. N.Y. February 16, 2010) (even if the defendant satisfies the test in <u>Roviaro</u>, disclosure of a testifying confidential informant is not required before trial); <u>United States v. Glover</u>, 583 F. Supp. 2d 5, 12 (D. D.C. 2008) ("the Court is inclined to agree with the government that <u>Roviaro</u> and its progeny apply only when the informant does *not* testify at trial") (emphasis in original).

As the Government points out, "A criminal defendant has no absolute right to a list of the government's witnesses in advance of the trial." <u>United States v. Johnson</u>, 713 F.2d 654, 659 (11th Cir. 1983); <u>accord</u> <u>United States v. Cerpas</u>, 379 Fed. Appx. 524, 528 (11th Cir. 2010) (same); <u>United States v. Aiken</u>, 76 F. Supp. 2d 1339, 1343 (S.D. Fla. 1999) (noting "there is no authority requiring the Government to supply witness lists or witness statements until that witness has testified on direct examination, unless such information is required sooner by <u>Brady</u> or <u>Giglio</u>"). In light of the fact that the Government has indicated that <u>Jencks Act</u> and <u>Giglio</u> information pertaining to the confidential informants testifying at trial, which will identify those witnesses, will be made available one week before trial, Defendants have not

119

demonstrated grounds for earlier disclosure of Government witnesses or information related to those witnesses.  See, e.g., United States v. Moore, 2010 WL 5092719, at **2-3 (W.D. Ky. December 7, 2010) (noting that a defendant does not generally have a right to early disclosure of impeaching information, the Government's agreement to abide by its Brady, Jencks and Giglio obligations regarding testifying confidential informants was sufficient); United States v. Gaines, 2009 WL 2849733, at *4 (M.D. Tenn. September 2, 2009) (denying the defendant's request for early disclosure of testifying confidential informant's identity and impeachment information related to the witness, the court noted that "the Government is not required to provide such information to the Defendant at this juncture in the proceedings" and also noted that the Government had agreed to provide the information "in advance of trial").  Neither the Federal Rules of Criminal Procedure, Brady, the Jencks Act, or Giglio require the disclosure of information related to a testifying witness any earlier than the Government has offered to make disclosure in this case.[35]

---

[35]And the court found nothing in these cases or other binding legal authority or the rules requiring the Government to provide information concerning the location of any witness, whether a confidential informant or not.  However, if the Government has secured or otherwise has control over the location of one or more of the confidential informant witnesses, the court is to be advised of that fact for a determination to be made as to whether Defendants should be allowed access to the witness(es) prior to trial.

In <u>United States v. Jordan</u>, 316 F.3d 1215, 1251-53 (11th Cir. 2003), the Eleventh Circuit Court of Appeals explained application of the federal rules and <u>Brady</u> to the Government's discovery obligations. Both Rule 16(a)(1)(C) and the <u>Jencks Act</u> require the disclosure of prior statements of a witness after the witness testifies on direct "when the witness is tendered for cross-examination." <u>Id.</u> at 1251-52. And, while the Government has an ongoing duty to provide <u>Brady</u> materials, that is, information materially favorable to the defense, this obligation "does not 'create a broad, constitutionally required right of discovery.'" <u>Id.</u> at 1251 (citation omitted). "[U]nder <u>Brady</u>, the government need only disclose during pretrial discovery (*or later, at the trial*) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings." <u>Id.</u> at 1252 (emphasis added). To the extent <u>Giglio</u> or impeachment evidence might fall within the scope of <u>Brady</u>, "[i]mpeachment evidence should be disclosed in time to permit defense counsel to use it effectively in cross-examining the witness." <u>Id.</u> at 1253; <u>see also</u> <u>Aiken</u>, 76 F. Supp. 2d at 1344 (noting that <u>Giglio</u> material should be disclosed in time for defense to use effectively at trial, the court surveyed cases and found the Eleventh Circuit Court of Appeals and other courts had upheld convictions when impeaching information was disclosed at trial, even on the day the witness testified) (citations omitted). As noted, although not

121

required to do so, the Government will produce <u>Jencks Act</u> and <u>Giglio</u>/impeachment evidence approximately one week before trial, which under the circumstances of this case is sufficient time for Defendants to prepare for effective cross-examination.

One final note, to the extent that Defendants seek pretrial disclosure of the identities of the confidential informants and related impeachment information for the purpose of addressing suppression motions, this basis is not a valid ground for ordering early disclosure. In <u>United States v. Mendoza</u>, 433 F.2d 891 (5th Cir. 1970), the former Fifth Circuit Court of Appeals stated, ". . . the rule is well-established that the Government need not disclose the identity of an informer when the sole purpose to be served is to attack the probable cause supporting a search warrant." <u>Id.</u> at 894. Recent decisions of this and other circuit courts of appeals indicate that this rule remains valid. <u>See, e.g.</u>, <u>United States v. Booker</u>, 131 Fed. Appx. 234, 241 (11th Cir. 2005) (denying request for disclosure, the court noted that informant's testimony "only would have been relevant for establishing whether the government had probable cause to search Booker's residence"); <u>United States v. Gray</u>, 47 F.3d 1359, 1365 (4th Cir. 1995) (denying request for disclosure of informant's identity based on stated need to assist in garnering evidence which would entitle the defendant to a <u>Franks</u> hearing); <u>United States v. Cummins</u>, 912 F.2d 98, 103 (6th Cir. 1990) ("Due process does not require the

disclosure of an informant's identity at a suppression hearing."); <u>United States v. Hernandez</u>, 829 F.2d 988, 992 (10th Cir. 1987) (denying request to disclose identity of informant in order to test validity of information in an affidavit).

For the foregoing reasons, the court **DENIES** Defendants' motions [Doc. 265, 199, and 269] for disclosure of the identities of confidential informants and related information.[36]

### Defendant Baza's Motion for Severance

Defendant Baza filed a motion [Doc. 198] to sever his trial from that of his co-Defendants pursuant to Fed. R. Crim. P. 8, 12 and 14 and to the Sixth Amendment. The Government has responded agreeing to a partial severance of Defendant's trial from that of the co-Defendants who did not participate in the events of April 2, 2010, along with Defendant. [Doc. 378]. For the reasons stated, the court recommends adopting the Government's severance proposal.

---

[36]Because the court has resolved the motions on the grounds that the actively participating confidential informants will be Government trial witnesses, the court will not address the Government's alternative grounds for denying the motions under <u>Roviaro</u>. [Doc. 299 at 7-8].

123

## I.  Background Facts

On January 18, 2011, a federal grand jury sitting in this district returned a ten count indictment with a forfeiture provision naming Defendant Baza and fourteen co-Defendants with violations of the federal drug laws and naming some of Defendant Baza's co-Defendants with violations of one or more firearms statutes. [Doc. 1]. Defendant Baza was named in Count One with thirteen of the named co-Defendants for a violation of 21 U.S.C. § 846, that is, a conspiracy beginning in April 2009 and continuing until January 2011 to violate the federal drug laws involving cocaine, methamphetamine and marijuana. [Id.]. In Count Two Defendant Baza and co-Defendants Bernaldo Molina-Cardenas, Eleazar Aguirre Rivera, Pablo Garcia, Wilber Avalos Perez, and Jose Carlos Soto-Pineda are charged with possessing with the intent to distribute, on April 2, 2010, quantities of cocaine, methamphetamine and marijuana, in violation of 21 U.S.C. § 841. [Id.]. And in Count Three, Defendants Molina-Cardenas and Aguirre Rivera, on the same date, are charged with possession of firearms in furtherance of the drug offense charged in Count Two, in violation of 18

U.S.C. § 924(c).[37]  [Id.].  The remaining counts do not charge Defendant Baza and allege further criminal conduct occurring on or after May 1, 2010.  [Id.].

## II.    Discussion

Defendant contends that severance should be granted because his co-Defendants may raise antagonistic defenses, citing Rule 14 and Zafiro v. United States, 113 S. Ct. 933 (1993), and because the indictment includes eight counts in which Defendant is not charged and/or involving conduct which occurred after Defendant was taken into custody on April 2, 2010, contending that introduction of the evidence pertaining to those counts will "taint" the case against the Defendant, citing Rule 14 and United States v. Blankenship, 382 F.3d 1110 (11th Cir. 2004).[38]  [Doc. 198].  Because the Government has agreed to a severance of Defendant's trial from that of all remaining Defendants excepting Defendants Garcia, Molina-Cardenas, and Aguirre Rivera, all

---

[37]The events resulting the charges in Counts Two and Three were the subject of Defendant Baza's motion to suppress evidence and are set out in the discussion of that motion *supra*.

[38]Although referenced in his motion, Defendant does not present any grounds for severance pursuant to Rule 8 or based on the Sixth Amendment.  To the extent Defendant raises a concern about the introduction of a confession by a co-Defendant which raises a Bruton v. United States, 88 S. Ct. 1620 (1968), issue [Doc. 198, ¶ 11], the Government has responded that it is unaware of any Bruton issues [Doc. 378 at 2 n.2].  The court will not further address Rule 8, the Sixth Amendment or Bruton in resolving the motion for severance.

AO 72A
(Rev.8/82)

of whom are named in Counts One and Two with Defendant Baza, and all of whom allegedly were participants in the events on April 2, 2010, resulting Defendant's arrest, the court will address whether Defendant is entitled to a trial separate from these three co-Defendants on Counts One, Two and Three of the indictment.

As noted, Defendant alleges that a joint trial with his co-defendants will deny him a fair trial, in part due to allegedly antagonistic defenses, and will unduly prejudice him.[39] He seeks a severance based on Fed. R. Crim. P. 14. "Rule 14(a) states, 'If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires.'" Blankenship, 382 F.3d at 1120 (citation omitted). The Eleventh Circuit Court of Appeals further stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion.'" Id. (citation omitted). "In practice, the general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases." United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); see

---

[39]As the Government correctly points out, although offered the opportunity to do so, Defendant Baza failed to perfect his motion for severance. [Doc. 378 at 1-2].

also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (same). To justify severance, a defendant must show compelling prejudice to the conduct of his or her defense resulting in fundamental unfairness. See Baker, 432 F.3d at 1236; United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997). "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'" United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also Browne, 505 F.3d at 1268.

Defendant is charged in a conspiracy to distribute drugs. It is the general rule in conspiracy cases that "defendants indicted together should be tried together." United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998); see also Browne, 505 F.3d at 1268 (noting that it "is particularly true in conspiracy cases" that persons indicted together be tried together); United States v. Gossett, 877 F.2d 901, 904 (11th Cir. 1989) ("Generally, coconspirators should be tried jointly."). In order to overcome this presumption and to establish that severance of Defendants is mandated pursuant to Rule 14, Defendant must not only show specific prejudice but also that "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Blankenship, 382 F.3d at 1123 (citation omitted). Defendant has not

AO 72A
(Rev.8/82)

made any showing of the potential violation of any trial right if a further severance is not granted.

The second category mandating a severance, that is, preventing the jury from making a reliable judgment, applies generally to three situations. "First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant." Blankenship, 382 F.3d at 1123. However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. See Baker, 432 F.3d at 1236 (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants,' . . . even when the disparity is 'enormous'") (quoting Schlei, 122 F.3d at 984). Severance is also mandated upon a showing of prejudice "in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." Blankenship, 382 F.3d at 1124. And, "[f]inally, severance is required . . . where one defendant is being

128

charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants." Id. at 1125. The only Defendants that the Government proposes trying together are those allegedly involved in the events of April 2, 2010, and involving charges arising out of the conduct alleged to have occurred on that date, including the possession of the firearm by two of the co-Defendants and charged in Count Three. [Doc. 378]. Defendant has made no showing of any prejudice, much less undue prejudice, flowing from being tried with those co-Defendants on these three counts.

Defendant also has made a conclusory claim that a joint trial may result in his co-Defendants raising defenses antagonistic to the defense he may raise at trial due to his alleged lack of contact with a confidential informant.[40] [Doc. 198, ¶ 12]. While "[t]he assertion of mutually antagonistic defenses may satisfy the test for compelling prejudice[,] . . . [t]o warrant severance, defenses must be antagonistic to the point of being irreconcilable or mutually exclusive." Cassano, 132 F.3d at 652 (citations and

---

[40]However, the court notes that on April 2, 2010, as the evidentiary hearing on Defendant's motion to suppress established (see discussion *supra*), Defendant was present at a meeting with the confidential informant prior to the drug delivery and then was present at the residence, also with the informant, where the drug transaction took place. Whether Defendant did or did not have contact prior to April 2, 2010, with the informant, appears to be of little import.

129

internal quotation marks omitted); see also United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995) ("'[d]efenses can only be found to be antagonistic if the jury, in order to believe the core of testimony offered on behalf of [one] defendant must necessarily disbelieve the testimony offered on behalf of his codefendant'") (citations omitted). The fact that the evidence of one defendant may inculpate a co-defendant does not mandate severance. Blankenship, 382 F.3d at 1125-26 (court found that attorney's "vitriolic, mudslinging" against co-defendants and shifting blame to co-defendants did not establish grounds for severance); United States v. Talley, 108 F.3d 277, 280 (11th Cir. 1997) (finding that the defendants' defenses, "consisting of claiming to be innocent and accusing the other of the crime," did not establish mutually antagonistic defenses requiring severance). Furthermore, "any prejudice resulting from mutually antagonistic defenses could be alleviated by proper limiting instructions." Talley, 108 F.3d at 280 (citing Zafiro, 113 S. Ct. at 939). Defendant simply has not established that mutually antagonistic defenses will be presented at trial or that curative instructions will fail to address his concerns.

## III.    Conclusion

For the foregoing reasons, the Government **RECOMMENDS** that Defendant Baza's motion [Doc. 198] for severance be **GRANTED IN PART** and **DENIED IN**

130

**PART** in accordance with the Government's proposed trial of Defendant with co-Defendants Garcia, Molina-Cardenas, and Aguirre Rivera on Counts One, Two and Three of the indictment [Doc. 378 at 2].

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that:

Defendant Narciso Flores-Ortiz's motion [Doc. 196] to suppress evidence be **DENIED AS MOOT**.

Defendant Santiago Villanueva Pineda's motion [Doc. 264] to suppress evidence be **DENIED** and motion [Doc. 265] for disclosure of confidential informant be **DENIED**;

Defendant Juventino Baza's motion [Doc. 201] to suppress evidence be **DENIED**, motion [Doc. 199] for disclosure of confidential informant be **DENIED**, and motion [Doc. 198] for severance be **GRANTED IN PART** and **DENIED IN PART** as set forth *supra*; and

Defendant Gregory Harrison's motion [Doc. 272] to suppress be **DENIED** and motion [Doc. 269] for disclosure of confidential informant be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

AO 72A
(Rev.8/82)

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendants Santiago Villanueva Pineda (1), Ramiro Alvarado Gonzalez (2), James Torres (3), Tarsicio Bravo-Carvajal (4), Bernaldo Molina-Cardenas (5), Juventino Baza (7), Pablo Garcia (8), Jose Carlos Soto-Pineda (10), Isaias Mondragon (12), Narciso Flores-Ortiz (13), Gregory Earl Harrison (14), and Chadwick Hudspeth (15).

**SO ORDERED AND RECOMMENDED**, this 4th day of June, 2012.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)